994 P.2d 625

STATE of Idaho, Plaintiff–Respondent,

v.

Vic SLATER, Defendant–Appellant.

No. 24480.

Court of Appeals of Idaho.

Dec. 22, 1999.

Review Denied March 3, 2000.

Rude, Jackson Daugharty, Coeur d'Alene, for appellant.  Dan J. Rude argued.

Hon. Alan G. Lance, Attorney General; Rebekah A. Cude, Deputy Attorney General, Boise, for respondent. Rebekah A. Cude argued.

SCHWARTZMAN, Judge.

Vic Slater entered a conditional guilty plea under I.C.R. 11(a)(2) to possession of methamphetamine with intent to deliver. He was sentenced to a term of seven years with thirty-eight months fixed. On appeal, he argues that the district court erred in denying his motion to suppress evidence obtained during execution of the first search warrant for the person of Brian Snowball, a contemporaneous protective sweep and detention of Slater and his family, and through a second search warrant of his home. For the reasons stated below, we affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 11, 1996, Officer Gunderson telephoned the Shoshone County magistrate to request a search warrant for the person of Brian Snowball. Under oath, Gunderson stated that he had received an arrest warrant from Mineral County, Montana, indicating that Snowball was wanted for possession of dangerous weapons.[1] Gunderson told the magistrate that Mineral County authorities had advised him that Snowball was staying at 207 River Street in Wallace, the home of Victor Slater. Gunderson averred that he had confirmed Snowball's presence by both seeing Snowball at Slater's house the day before and through a third person who had visited with Snowball and told Gunderson that Snowball was staying there. Gunderson said he believed Snowball was still at 207 River Street. Thereafter, the magistrate reviewed a faxed copy of the proposed search warrant and signed it.

Prior to the execution of the search warrant for Snowball, Gunderson and other officers met to discuss the operation and their knowledge of Snowball and Slater. The available information was that: (1) Slater was a convicted drug felon whom it was believed had been charged with resisting a police officer in the past; (2) Snowball had been previously charged with aggravated assault and was now charged with possession of dangerous drugs; (3) an unidentified concerned citizen had told the police there was a lot of traffic at Slater's house; (4) Slater had a few weeks previous told Gunderson, during a traffic stop, that he used to be a drug dealer, but had quit a week ago.

That afternoon, at about 5:25, Gunderson and other Shoshone County sheriff officers approached Slater's house to serve the search warrant. From outside the front door, the officers heard people inside. They knocked and announced three times, receiving no response from the occupants. As the officers entered, they saw a child in the living room and Snowball standing by the bar. Slater and his wife were in the kitchen. Upon seeing the officers, Slater bolted for the back of the house and Snowball tried to hide behind the living room bar. Slater and Snowball were quickly subdued and handcuffed.

Gunderson and two other officers decided to conduct a "protective sweep" – a cursory look for anyone who might be lurking out of sight but within close enough proximity to attack the officers or come to the aid of Snowball – of the residence. Beyond the closed door at the end of the living room, just adjacent to the kitchen, a steep and narrow half flight of stairs led to a small landing and another half flight extending away at an angle out of view from the doorway to the second floor. The officers climbed the stairs, accompanied by their police dog, and arrived at a landing immediately at the top of the stairs between the upstairs bedroom and an office. Looking into the bedroom and office, the officers saw in plain view a set of scales and a mirror; both covered in white powder residue, and two pipes in an open cigar box in an open file cabinet drawer. The officers

1. Snowball was actually wanted for possession of dangerous drugs. At the suppression hearing, Gunderson testified that he had mistakenly and unintentionally informed the magistrate that the Mineral County, Montana warrant was for possession of dangerous weapons. Gunderson's mistake is not at issue in this appeal.

immediately returned to the first floor. Slater, without prompting, told Gunderson that he would cooperate with law enforcement and that there were more drugs and paraphernalia in the house than just what was in plain view. Slater also produced a rock of methamphetamine from his shirt pocket. While Slater was showing Gunderson additional paraphernalia, Vicki Slater, Slater's wife, asked for her purse so she could have a cigarette. Before handing the purse to her, an officer searched it for weapons and found two more items of paraphernalia – a pipe and forceps.

After writing up Slater's statement and listing the drugs and paraphernalia the officers had found, Gunderson attached the writing to an affidavit and applied for a second search warrant for Slater's house. At the magistrate's request, Gunderson wrote an additional statement of why a nighttime warrant was necessary on the attachment to his affidavit. Gunderson swore under oath before the magistrate that the signatures on the affidavit and attachment were his and the statements therein were true. The officers returned to Slater's house with the second search warrant. There, the officers found about thirty grams of marijuana, twenty to twenty-five grams of methamphetamine and more paraphernalia.

Slater was charged with possession of marijuana and methamphetamine with intent to deliver, possession of marijuana with intent to deliver in the presence of children under eighteen, an enhancement for possession of methamphetamine with intent to deliver within 1000 feet of a public school, and possession of drug paraphernalia. Slater filed a motion to suppress, challenging the police officers' protective sweep of the second floor of his house and asking the court to exclude all the drugs and paraphernalia discovered there pursuant to both the protective sweep and the second search warrant. The district court found that:

> Officers Gunderson and Garitone, as well as a canine unit, went upstairs for the purposes of conducting a protective sweep of the area. .... While upstairs, Gunderson and Garitone saw some scales and other drug paraphernalia in plain view.

Defendant then took Gunderson aside and advised that he would be willing to work with law enforcement, saying that there was more paraphernalia upstairs than that in plain view. Gunderson, defendant and Pinehurst [Police] Chief Kitchen went upstairs where defendant opened a desk drawer containing further pieces of paraphernalia.

The court denied the motion. Slater then pled guilty to possession of methamphetamine with intent to deliver pursuant to I.C.R. 11(a)(2), preserving his right to appeal the denial of his motion to suppress. This appeal follows. We affirm.

## II.

### PROTECTIVE SWEEP

Slater has not challenged the district court's factual findings. Slater simply argues that the officers lacked information and inferences that would lead a reasonable and prudent officer to believe that the second floor of his house might harbor a person who would pose a danger to the arresting officers. Thus, he argues that the district court erred in determining that the protective sweep of the upstairs was justified.

### A. Standard Of Review

In evaluating a ruling on a motion to suppress, we defer to factual findings of the trial court unless they are clearly erroneous, but we freely review the trial court's determination as to whether constitutional standards have been satisfied in light of the facts found. *State v. Morris*, 131 Idaho 562, 565, 961 P.2d 653, 656 (Ct.App.1998); *State v. Pick*, 124 Idaho 601, 603, 861 P.2d 1266, 1268 (Ct.App.1993); *State v. Heinen*, 114 Idaho 656, 658, 759 P.2d 947, 949 (Ct.App.1988). The reasonableness of a search or seizure is a question of law requiring our independent review. *Morris*, 131 Idaho at 565, 961 P.2d at 656; *State v. McIntee*, 124 Idaho 803, 804, 864 P.2d 641, 642 (Ct.App.1993); *Heinen*, 114 Idaho at 658, 759 P.2d at 949.

### B. The Protective Sweep Of The Second Floor Of Slater's Home Was Reasonable On These Facts

The Fourth Amendment to the United States Constitution and Article I,

§ 17 of the Idaho Constitution protect "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." *State v. Thompson,* 114 Idaho 746, 749, 760 P.2d 1162, 1165 (1988). Warrantless searches or seizures are presumptively unreasonable, and therefore illegal, unless they come within one of several judicially recognized exceptions to the warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564, 575–76 (1971); *State v. Vega,* 110 Idaho 685, 687, 718 P.2d 598, 600 (Ct.App.1986). One recognized exception to the warrant requirement for governmental searches is the protective sweep, which the United States Supreme Court first addressed in *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

In *Buie,* the United States Supreme Court delineated between two types of protective sweeps pursuant to a lawful arrest. In "Type 1" searches, the Court held that as an incident to arrest the officers could, "as a precautionary measure and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie,* 494 U.S. at 334, 110 S.Ct. at 1098, 108 L.Ed.2d at 286. In order to search further – a "Type II" search – "there. must be articulable facts which taken together with the rational inferences from those facts, would warrant a reasonable and prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* This court has recently discussed "Type II" sweeps, explaining:

> *Buie, Terry* and related cases establish that the important need of law enforcement personnel to take precautions for the safety of themselves and others at the scene may take precedence over an individual's privacy interest, but the circumstances are narrowly confined to prevent governmental overreaching. The *Buie* opinion emphasizes that a protective sweep is not constitutionally permissible unless the officer held an objectively reasonable suspicion, based upon articulable facts, that the place to be searched harbors an individual who poses a threat to officers at

the scene. *Buie,* 494 U.S. at 334, 337, 110 S.Ct. at 1098, 1099, 108 L.Ed.2d at 286, 288. The general desire to be sure that no one is hiding in the place searched is not sufficient to meet this requirement. *See United States v. Ford,* 56 F.3d 265, 270 (D.C.Cir.1995).

*State v. Schaffer,* 133 Idaho 126, 131, 982 P.2d 961, 966 (Ct.App.1999).

■ As we stated in *Schaffer,* incident to arrest, the officers, as a precautionary matter and without probable cause or reasonable suspicion, may look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. 133 Idaho at 132, 982 P.2d at 967. In that case, a forty-seven foot shed, the outer walls of which were ninety feet from a transit bus in which Schaffer lived and ten feet from the cargo truck he used as a drug lab, was held not to be immediately adjoining either the truck or the bus and thus a protective sweep could not be conducted without reasonable suspicion.

■ The present case is distinguishable. The stairway leading to the second floor of Slater's home was immediately adjoining both the front room where Snowball was seized and the kitchen area where Slater and his wife were detained. A closed door concealed a steep, narrow stairway leading immediately to a landing at the top of the stairs, which was not visible from the bottom of the stairway. An attack could have been immediately launched by a person, out of view, on or at the top of the stairway. Thus, without reasonable suspicion, the officers could permissibly mount the stairs to determine that no one was there to launch a surprise attack upon them in the living room and kitchen immediately below. Beyond that, reasonable suspicion, based upon articulable facts, was required. *Buie,* 494 U.S. at 334, 110 S.Ct. at 1098, 108 L.Ed.2d at 286. For that, we compare the information available to the officers in *Schaffer* and the present case.

In *Schaffer,* the property searched had been under surveillance for several hours before the search warrant was executed. 133 Idaho at 131, 982 P.2d at 966. The only

person to visit the property left and did not return. Having no further information about any other persons on the premises, the sweep was conducted without articulable facts creating reasonable suspicion that the shed harbored anyone posing a direct or imminent threat to the officers at the scene.

Here, in order to avoid tipping off Snowball to law enforcement's interest in him, Gunderson did not go to Slater's residence prior to obtaining the search warrant. Gunderson had learned of the Montana arrest warrant for Snowball just prior to requesting the search warrant for Snowball. The search warrant, issued at 4:03 p.m., required that the search be executed prior to 8:00 p.m. Gunderson worked to assemble his task force and served the search warrant at 5:25 p.m. Before the search warrant for Snowball was executed, the officers were made aware of Slater and Snowball's violent criminal histories – resisting arrest and aggravated assault respectively – the drug charges against Snowball and Slater's admission to being a recently "reformed" drug dealer, and the citizen's complaint of numerous visitors to and traffic around Slater's house. There was no response from the occupants to the officers' repeated knock and announce. Upon the officers' entry, Slater attempted to run towards the back of the house and Snowball attempted to hide behind the bar in the living room. Slater testified that there was a lot of yelling from police and screaming and crying from Slater's four children during the execution of the search warrant for Snowball. In other words, the officers' entry into the residence and seizure of Snowball quickly escalated into a noisy melee and chaotic event.

The district court concluded that the *Buie* "Type II" sweep requirements were satisfied because the exact number of occupants was unknown, there was no response to the officers' repeated knock and announce, Slater and Snowball attempted to flee and hide, both were suspected of being involved in violent crimes and drugs, and the officers reasonably believed a protective sweep was necessary under the totality of these circumstances.

We note that there is no *per se* drug case exception to the reasonable suspicion requirement. However, the type of offense suspected and the officers' experience with such offenses are relevant factors when considering the threat potential to the officers on the premises. The Idaho Supreme Court most recently upheld a Type II protective sweep based upon a lesser quantum of information available to the officers in *State v. Revenaugh*, 133 Idaho 774, 992 P.2d 769 (1999).[2] Police need not have actual knowledge or absolute proof that someone is lurking in the house who poses a threat to the officers. *Revenaugh*, 133 Idaho at 777, 992 P.2d at 772. After effecting an arrest or detention at a residence, if the officers can point to articulable facts, based upon their knowledge and experience, that support their belief that others may be on the premises, the officers can sweep the premises for other persons who might be in the house. *Id.* Reasonable suspicion only requires articulable facts and inferences supporting a reasonable belief.

From the articulable facts and the inferences therefrom, it was reasonable for the officers to believe someone other than the defendant, his wife, children and Snowball could be in the house. It was also reasonable for the officers to believe that, having knocked and announced their presence without any answer and seeing Slater and Snow-

2. In *Revenaugh*, the Court upheld a Type II protective sweep of a residence, affirming the district court's finding of reasonable suspicion based upon the following facts: the officer, investigating the trajectory of four apparent bullet holes in a building, saw three men inside the open doorway of a nearby residence stripping marijuana leaves from two large trash bags of harvested marijuana. When he ordered the three men to "stop," someone inside yelled "cop" and slammed the front door shut. After the officer opened the door and was able to coax the three men out, he conducted a protective sweep of the residence in order to make sure no one else was in the house. During the sweep, the officer observed marijuana and paraphernalia on a counter. The district court found reasonable suspicion to justify the protective sweep based on these facts: the officer could not see into the house until entering it; Revenaugh had retreated into the house when ordered out; and the officer was dealing with a marijuana operation which, in his training and experience, often involve paranoid people with weapons.

ball's attempts to run and hide, someone else inside the residence could have easily secreted him or herself upstairs. The distance from the landing upstairs to the living room was close, the route being the short narrow staircase running immediately to a door in the living room and the adjacent kitchen.

We hold the officers acted reasonably in conducting a protective sweep – a limited, speedy and cursory inspection for persons – of the second floor of the house. Based upon the combination of unfolding circumstances set forth herein, we conclude there was a sufficient level of reasonable, articulable suspicion that someone might be in the residence who could pose a threat to the officers on the scene to justify a cursory search for such person or persons. Accordingly, we affirm the district court's denial of Slater's motion to suppress the evidence obtained pursuant to the protective sweep and the fruits thereof.

### III.

### THE SECOND SEARCH WARRANT WAS VALID BECAUSE GUNDERSON SWORE UNDER OATH THAT THE SIGNATURES ON THE AFFIDAVIT WERE HIS AND THE WRITTEN STATEMENTS WERE TRUE

Slater argues that the second search warrant was invalid because it was not supported by a proper affidavit, sworn to and signed in the magistrate's presence, and that no record was made of Gunderson's testimony in support of the search warrant as required by I.C.R. 41(c). The state argues that there is no requirement under I.C.R. 41(c) or I.C. §§ 19–4403, –4404 that the affidavit be physically signed in the presence of the judge issuing the search warrant and that only an oral affidavit need be recorded if a search warrant is issued.

### A. Standard Of Review

■ Where the district court's decision turns upon the interpretation of an Idaho statute or rule, we exercise free review. *See State v. Larios*, 129 Idaho 631, 633, 931 P.2d 625, 627 (1997) (regarding the district court's interpretation of I.C.R. 25(a)); *State v.*

*Moore*, 129 Idaho 776, 783, 932 P.2d 899, 906 (Ct.App.1996) (concerning the district court's interpretation of a statute); *State v. Dallas*, 126 Idaho 273, 274, 882 P.2d 440, 441 (Ct. App.1994) (concerning the district court's interpretation of I.C.R. 35).

### B. Analysis

At the preliminary hearing, Gunderson testified that he could not recall whether he signed the search warrant affidavit and handwritten additions to the second page and then presented them to the court or signed them in the magistrate's presence. Gunderson testified that he spoke with the magistrate on the phone and in person regarding the search warrant of Slater's house for drugs, and he was sworn in before the magistrate as set forth in the stipulated facts.

At the hearing on the motion to suppress, no argument or evidence was presented on the issue of the validity of Gunderson's affidavit in support of the second search warrant. Both parties relied upon the transcript of the preliminary hearing and stipulated facts to support their positions.

■ The district court ruled that the affidavit in support of the search warrant was valid, explaining:

The facts stipulated to by the parties establish that, under oath, Gunderson swore that the signatures were his and that the information contained in the paperwork were true and accurate to the best of his knowledge. This is sufficient. Defendant argues that because no record of Gunderson's testimony, or of the proceedings before [the magistrate] wherein the warrant was obtained was made, the warrant should be found defective pursuant to the holding in *State v. Zielinski*, 119 Idaho 316, 805 P.2d 1240 (1991). This reliance is misplaced. In *Zielinski*, the affidavit was oral and a record was attempted to be preserved by electronic tape recording, but the tape recorder failed. There was never a written affidavit, and there was thus no record of the oral proceedings. Here, we have the written affidavit and facts stipulated to by both parties concerning its

execution. We have a record that satisfies both I.C.R. 41(c) and I.C. § 19–4403.

Rule 41(c) states in pertinent part that: "[a] warrant shall issue only on an affidavit or affidavits sworn to before a district judge or magistrate or by testimony under oath and recorded and establishing the grounds for issuing a warrant." The stipulated facts establish that Gunderson was sworn in before the magistrate, he stated that all the facts in his affidavit were true and correct, and that the signature on the first page was his own. The affidavit was signed by Gunderson in three places and acknowledged by the magistrate. By the letter of Rule 41(c), the affidavit was sufficient. Idaho Code §§ 19–4401 – 4420 provides no further requirements. Thus, the district court properly concluded that the affidavit was legally sufficient to support the issuance of the search warrant for drugs in Slater's home. Accordingly, the district court's ruling on the validity of the affidavit is affirmed.

## IV.

### ISSUES RAISED IN SUPPLEMENTAL BRIEFING

Slater asserts on appeal that he was unlawfully arrested because Gunderson's task force officers handcuffed him during execution of the search warrant for Snowball and the contemporaneous protective sweep. Slater also asserts that his statement to Gunderson, volunteering·to cooperate by showing them where more drug paraphernalia and drugs could be found, was tainted by his "unlawful" arrest.

■ We note that the power to search under a valid search warrant, founded on probable cause, implicitly carries with it the limited authority to safely detain the occupants of the premises while a proper search is conducted. *State v. Fairchild*, 121 Idaho 960, 966, 829 P.2d 550, 556 (Ct.App.1992) citing *Michigan v. Summers*, 452 U.S. 692, 701–05, 101 S.Ct. 2587, 2593–95, 69 L.Ed.2d 340, 348–51 (1981). Slater was not under arrest. He was merely detained while the officers conducted their lawful search. Handcuffing Slater, an admitted recently "reformed" drug dealer with a history of violence who had attempted to flee when the officers entered his home to conduct a lawful search, was reasonable under the circumstances.

■ Thereafter, when the officers returned from upstairs after conducting the protective sweep, as outlined above, Slater initiated conversation with Gunderson and told him that there were more drugs and paraphernalia in the house than what the officers had seen upstairs. As the district court found, Slater volunteered his statement in an attempt to ensure that he would not be incarcerated. Accordingly, there was no ground for suppression of Slater's voluntary statement, as it was not the result of "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ Finally, although we need not address the merits of Slater's challenge to the search of Vicki Slater's purse since she is not a party in this action and Slater's privacy interest in his wife's purse is not clear on this record, we do so briefly. When Vicki Slater asked for her purse so that she could have a cigarette, the officer handing her the purse quickly searched it for weapons and found two items of drug paraphernalia – a drug pipe and forceps. The officers, in executing the search warrant, could lawfully have patted down the adult occupants for weapons for officer safety reasons. *See generally Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Summers*, 452 U.S. at 705, 101 S.Ct. at 2595, 69 L.Ed.2d at 351; *State v. Fleenor*, 133 Idaho 552, 989 P.2d 784 (Ct. App.1999); *Fairchild*, 121 Idaho at 966–67, 829 P.2d at 556–57; *compare State v. Zapp*, 108 Idaho 723, 727, 701 P.2d 671, 675 (Ct. App.1985) (suggesting that a pat-down of the paper sack in Zapp's possession might have been justified if it had been conducted for "officer safety" reasons under the facts of the case). The "frisk" of Vicki Slater's purse for weapons, after she had specifically requested it to obtain a cigarette during the continued course of execution of the search warrant, was reasonable under the circumstances.

■ Moreover, even assuming Slater had grounds for challenging the search of Vicki

Slater's purse, the pipe and forceps were not essential to the request for the second search warrant. Two other pipes, a scale and a mirror covered in white powder residue, the rock of methamphetamine Slater produced from his shirt pocket and Slater's voluntary statement that there were other drugs and paraphernalia in the home, were more than sufficient to establish probable cause for the second search warrant. Thus, even if the items seized from Vicki Slater's purse were excised from the affidavit, the second search warrant would still be valid.

## V.

## CONCLUSION

We hold that the district court correctly ruled that the officers had reasonable suspicion to conduct a protective sweep of the second floor of Slater's home. The contents of and signatures on the affidavit for the second search warrant were sworn as true and correct before the issuing magistrate; thus, that search warrant was supported by a proper affidavit. Slater's statement to the officers, offering to show them where more paraphernalia and drugs could be found in his home, was voluntary and not the product of custodial interrogation. The search of Vicki Slater's purse was justified for officer protection. Accordingly, the denial of Slater's motion to suppress is affirmed. We note that Slater was released on bond pending appeal. This case is remanded to the district court for execution of sentence.

Chief Judge PERRY and Judge Pro Tem McDERMOTT concur.