67 P.3d 831

**STATE of Idaho, Plaintiff–Appellant,**

v.

**Ignacio Moro NUNEZ, Defendant–Respondent.**

No. 27954.

Supreme Court of Idaho,
Boise, January 2003 Term.

April 3, 2003.

Hon. Alan G. Lance, Attorney General, Boise, for appellant. Kenneth K. Jorgensen, Deputy Attorney General, argued.

Philip H. Gordon, Boise, for respondent. Phillip H. Gordon argued.

TROUT, Chief Justice.

This is an appeal from a district court order suppressing evidence seized pursuant to a search warrant.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Detective Kelly Montoya (Montoya) appeared before Magistrate Judge Renae Hoff (Judge Hoff) on two separate occasions for the purpose of obtaining search warrants for two different residences, a house at 619 Elgin Street in Caldwell (the Caldwell residence) and a trailer at 121 North First in Middleton (the Middleton residence). Mr. Gearld Wolff, Canyon County Deputy Prosecuting Attorney (Wolff), was also present at both of the hearings, which took place on November 16, 2000 and December 6, 2000.

At the November 16th hearing, Montoya was placed under oath and testified regarding information supplied from three confidential informants, CI1, CI2, and CI3, over the course of two and a half to three months. CI1 was involved in four controlled purchases of methamphetamine. On two separate occasions, CI1 purchased two "eight balls," an eighth of an ounce of methamphetamine, from one drug dealer. The first purchase was made six weeks prior to the hearing and the second about a month before the hearing. In addition, on two other occasions, CI1 purchased a single "eight ball" from another drug dealer. The first purchase occurred months prior to the hearing and the other, five weeks prior to the hearing. Based on CI1's personal observation, the drug traffic at the Caldwell residence was "nonstop" and the home was referred to as a "drive-in," due to the high-volume of traffic and the fact the purchasers of the drugs did not always turn off their car engines while they waited. CI1 also described how one of the drug dealers at the Caldwell residence broke down the drugs into "eight balls" for sale from the Caldwell residence, and another drug dealer would take three ounces of methamphetamine to sell at a local bar. After selling all of the drugs in his possession, this drug dealer would return to the Caldwell residence, drop off the money exchanged for the drugs, obtain more drugs, and go back to the bar again.

Montoya testified regarding information CI2 personally witnessed in the month prior to the hearing. CI2 said there were drugs at the Caldwell residence 24 hours a day, seven days a week. CI2 also corroborated CI1's account of the "nonstop" drug trafficking from the Caldwell property, wherein one drug dealer sold "eight balls" from the Caldwell residence and the other sold three ounces of methamphetamine at a time from a local bar. In addition, CI2 described the Caldwell residence as a holding house. From CI2's account, defendant Ignacio Moro Nunez (Nunez) was the main supplier, appearing at the Caldwell residence twice a day to exchange drugs and money. CI2 also told Montoya that Nunez had a firearm. Finally, CI2 reportedly purchased an ounce of methamphetamine personally from Nunez. Nunez initially attempted to sell CI2 something short of an ounce, and when CI2 complained, Nunez explained he had only money on him at that point, but would return with the requested drugs. According to CI2, Nunez left the Caldwell residence, went to an undisclosed location, and returned one hour later with the ounce as promised. From the information supplied by CI2, Montoya believed there was approximately a quarter to a half-pound of methamphatemine and $10,000 in cash held at the Caldwell residence throughout the day.

Montoya testified that CI2 had been to the Caldwell residence the day of the hearing, November 16th, and personally witnessed an ounce of marijuana, an ounce of cocaine, and two ounces of methamphetamine. CI2 explained these drugs were all that was left, the rest had been sold. CI2 also observed drug paraphernalia, including various types of scales, packaging material, and plastic bags, as well as records documenting the drug transactions.

Montoya further testified regarding information gathered from CI3 over the course of several weeks prior to the hearing. CI3 told Montoya that Nunez was also called "Nacho." In addition, CI3 confirmed information supplied by another, unidentified confidential informant relating to the existence of property in Middleton owned by Nunez. According to CI3, and corroborating CI2's account, Nunez held the mainstay of his narcotics at the Middleton residence, delivering the drugs periodically to the Caldwell residence.

Montoya also testified that he had personally observed Nunez at the Middleton residence. In addition, Montoya indicated that further police investigation uncovered county property records reflecting Nunez owned the Middleton residence, and a neighbor verified that an individual called "Nacho" actually lived at the Middleton residence.

Based on this information, Montoya requested two search warrants: one for the Caldwell residence and the other for the Middleton residence. Montoya asked to search for (1) controlled substances, including but not limited to methamphetamine/amphetamine, cocaine, and marijuana; (2) drug

paraphernalia, including scales, balances, plastic bags, and packaging materials; (3) personal books, papers, ledgers and documents associated with drug distribution; (4) U.S. currency; and (5) firearms. Judge Hoff issued both warrants for the purposes sought. Warrant 1387 provided Montoya with authority to search the Caldwell residence and 1388 provided Montoya with authority to search the Middleton residence. The November 16th warrants stated that they must be returned to the magistrate within ten days or they would expire.

Hours after the warrants were issued, Montoya was shot in the line of duty in an unrelated matter and the warrants were never executed. Therefore, on December 6, 2000, Montoya appeared again with Wolff before Judge Hoff to seek reissuance of the warrants for the same residences and the same purposes. Montoya was not separately sworn in at this second appearance, nor was he reminded that his testimony was under oath.

At this second appearance on December 6th, Judge Hoff took "judicial notice" of what had been presented to her on November 16th and Montoya provided new testimony related to recent drug activity at the Caldwell residence. Montoya explained to Judge Hoff that CI2 had indicated that the Caldwell residence had shut down for a couple of days, but was back up and running the night before the December 6th hearing. The night before the hearing, CI2 personally observed an ounce of methamphetamine as well as a large amount of foot and vehicular traffic at the Caldwell residence. CI2 also stated that one of the drug dealers from the Caldwell residence had moved in with Nunez at the Middleton residence. Based on these facts, Montoya testified that he believed the same pattern of activity was occurring with the same individuals as he had testified November 16th. In addition, Montoya further articulated the connection between the drug activity at the Caldwell residence and the Middleton residence. The crux of this connection was based on information from the confidential informants, who stated Nunez was the main supplier of drugs to the Caldwell residence and stored the drugs at the Middleton residence.

At the conclusion of Montoya's testimony, Judge Hoff again issued warrants 1387 and 1388, writing directly on the previous warrants, "Reissued this 6th day of Dec 2000" with a second signature. On December 12, 2000, Warrant 1388 was executed. Based in large part on the evidence seized pursuant to the search, Nunez was subsequently charged with trafficking in methamphetamine and/or amphetamine and possession of a controlled substance.

On March 2, 2001, Nunez filed an "Amended Motion to Suppress Evidence," which the state opposed. Rather than holding a hearing on the issue, both parties submitted "Stipulated Facts" and memoranda to the district court. On October 16, 2001, the district court filed a Memorandum, Decision and Order granting the Motion to Suppress holding (1) there is no legal authority for reissuing an expired search warrant; (2) the December 6th warrants were not supported by sworn testimony or affidavit, because Montoya was not separately sworn at the December 6th hearing; (3) neither the November 16th nor the December 6th search warrants for the Middleton property were supported by probable cause; and (4) Judge Hoff failed to act as a neutral and detached magistrate on December 6th when she took judicial notice of the testimony presented to her on November 16th.

## II.

## STANDARD OF REVIEW

A trial court's ruling on a motion to suppress evidence combines issues of law and fact. This Court will not overturn the trial court's factual findings unless they are clearly erroneous. *State v. Revenaugh*, 133 Idaho 774, 776, 992 P.2d 769, 771 (1999). However, in light of the trial court's factual findings, this Court exercises free review over whether the constitutional requirements have been met. *Id.*

## III.

## DISCUSSION

The Fourth Amendment to the United States Constitution and Article I,

§ 17 of the Idaho Constitution provide a legal limit on government action to protect individuals from unreasonable searches and seizures. *State v. Slater,* 133 Idaho 882, 885, 994 P.2d 625, 628 (Ct.App.1999). Searches and seizures without a valid warrant are presumptively unreasonable and, therefore, illegal, unless they come within a recognized exception to the warrant requirement. *Id.* at 886, 994 P.2d at 629. The exclusionary rule is the judicial remedy for addressing illegal searches and bars the admission or use of evidence gathered pursuant to the illegal search. *Stuart v. State,* 136 Idaho 490, 496, 36 P.3d 1278, 1284 (2001).

The district judge ordered the motion to suppress applied to all evidence seized pursuant to Warrant 1388, because he determined the warrant was illegal based on the following reasons: (1) there is no legal authority allowing a magistrate to simply reissue a warrant after it has expired; (2) Montoya's testimony before the magistrate was not sworn or otherwise under oath; (3) the warrant was not based on probable cause; and (4) Judge Hoff did not act in a neutral and detached manner. On appeal, this Court reverses the district judge's order on the motion to suppress.

### A. *The District Judge Erred in Granting the Motion to Suppress, Because the Warrant At Issue Is In Fact Valid.*

Contrary to the district court's determination, the warrant at issue here is valid; therefore, the motion to suppress evidence should not have been granted.

#### 1. *The Warrant is Not Invalid on the Basis that It Was Reissued by the Magistrate.*

Under Idaho statutory law, a warrant that has not been executed before expiration is void. I.C. § 19–4412 provides, "A search warrant must be executed and returned to the magistrate, within ten (10) days after its date; after expiration of this time the warrant, unless executed is void."

■ In this case, there is no dispute that the original warrants were not executed within ten days as required by law; the issue is whether the expired warrants could be reissued thereafter. The district court determined the warrants could not be reissued, simply because they were void. However, even though the expired warrants are void, in that they no longer provide legal authority for a search, there is no rule of law suggesting they cannot thereafter be revived upon receipt of new information regarding the same person or place named for the property or person specified.

It seems only logical and practical that a magistrate should be able to use a previously issued warrant and, provided that all of the requirements for issuing a valid search warrant are met, reissue the warrant on the same piece of paper. To rule otherwise would exalt form over substance. Under these circumstances, the only difference between reissuing an old warrant and issuing a new warrant relating to the same person or place is the use of new paper, a technicality without real merit. Therefore, because Judge Hoff was clearly issuing a new warrant based upon new evidence presented at the December 6th hearing and the warrant was signed again and dated by the magistrate on December 6th, it does not matter that she used the same warrants she signed previously November 16th and the warrant is not invalid simply on the basis that it was reissued.

#### 2. *Under the Unique Circumstances Presented Here, It Was Unnecessary for Montoya to be Sworn in Again in Order to Have His Testimony Considered.*

For a search warrant to be valid, the judge issuing the warrant must rely on an affidavit or affidavits sworn to before the judge or by testimony under oath and recorded that establish the grounds for issuing the warrant. IDAHO CONST. art. I, § 17; I.C.R. 41(c)[1], I.C.

---

**1.** "A warrant shall issue only on an affidavit or affidavits sworn to before a district judge or magistrate or by testimony under oath and re- corded and establishing the grounds for issuing a warrant." I.C.R. 41(c)

§§ 19–4403 [2] and 19–4404 [3]. Under I.C. § 9–1405, a party also has the option of an affirmation in place of an oath. "Any person who desires it, may, at his option, instead of taking an oath, make his solemn affirmation or declaration ..." I.C. § 9–1405.

The basic purpose behind an oath is to affirm the import and necessity of telling the truth. In the issuance of warrants, it helps ensure that the information upon which the magistrate relies in determining probable cause is accurate. Thus, the requirement of an oath prior to testifying in a probable cause hearing is not a mere technicality but a vital tool for protecting both individual freedom and judicial integrity, reminding law enforcement officials that the judicial system expects and relies on truthful testimony.

Under the unique circumstances presented here, where (1) the judge, the witness and the prosecutor all treated the December 6th hearing as a continuance of the initial proceeding and (2) the previously issued warrant was not executed and it appears there was no bad faith in the delay, it was unnecessary for Montoya to have an oath administered again. It is clear from the circumstances that Montoya was simply giving additional, up-to-date information to support the previous testimony in a proceeding that was treated by all parties as a continuation of the first. Thus, the warrant was not invalid on the basis that it was not supported by testimony under oath.

### 3. Considering the Information Supplied at the November 16th and December 6th Hearings, the Magistrate Did Not Err in Finding Probable Cause Existed

On appeal, this Court reviews a magistrate's decision to issue a search warrant "to ensure that the magistrate had a substantial basis for concluding that probable cause existed for the issuance of the warrant." *Id.* Great deference is paid to the magistrate's decision. *Id.* When determining whether to issue a search warrant, the magistrate must make a practical, common sense decision whether, given the totality of the circumstances set forth in the facts properly before the magistrate, there is a fair probability that contraband or evidence of a crime will be found in the place to be searched. *State v. Rounsville,* 136 Idaho 869, 873, 42 P.3d 100, 104 (Ct.App.2002) (citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983)).

The district judge determined the magistrate made an erroneous finding of probable cause with regard to the Middleton residence on both November 16th and December 6th. In so finding, the district judge noted (1) none of the confidential informants witnessed any activity at the Middleton address; (2) there was not enough information from the confidential informants linking Nunez to the Middleton address; and (3) Montoya failed to conduct appropriate surveillance of Nunez to determine whether Nunez traveled directly from the Middleton residence to the drug transaction at the Caldwell residence. For these reasons, the district court determined "[a] reasonable and prudent person could not conclude, based on the above information, that there would be a probability of narcotics being stored at [the Middleton residence]." This Court finds the district court in error and affirms the magistrate's findings of probable cause on both dates.

A review of the evidence submitted to the magistrate demonstrates probable cause to believe that evidence of criminal activities would be found at Nunez's home. While the bulk of the information from the confidential informants relayed to Judge Hoff through Montoya pertained to the drug activities at the Caldwell house, there was sufficient evidence tying such activity to Nunez and the Middleton residence so that Judge Hoff could reasonably conclude evidence of drug activity could be found at Nunez's Middleton residence. First, with regard to the Caldwell house, the drug activ-

---

**2.** "A search warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and place to be searched." I.C. § 19–4403.

**3.** "In lieu of a written affidavit, the magistrate may take an oral statement under oath which shall be recorded and transcribed." I.C. § 19–4404.

ity there was described as "non-stop" with a high volume of methamphetamine sales. Montoya estimated about a quarter to one-half pound of methamphetamine was being sold per day at the Caldwell house involving in excess of $10,000 in revenue. Second, connecting the drug activity to the Middleton residence was information supplied by two confidential informants who both explained Nunez was the main supplier of drugs to the Caldwell property. CI2 indicated Nunez was the main supplier of drugs to the Caldwell property, delivering drugs and collecting cash twice a day. Corroborating this account, CI3 also indicated Nunez owned property in Middleton, where he kept the mainstay of his drugs, delivering them periodically to the Caldwell residence. In addition, CI2 purchased drugs from Nunez. During this controlled sale, Nunez had to leave the Caldwell house in order to obtain the methamphetamine. Finally, Montoya personally observed Nunez at the Middleton property; county records demonstrated Nunez in fact owned the Middleton residence; and a neighbor confirmed that Nunez lived there.

Based on these facts, it was reasonable for the magistrate to conclude that Nunez was in fact the supplier of drugs to the Caldwell property and would have evidence of this extensive drug dealing at his Middleton residence. In support of this finding are decisions from the First Circuit, *United States v. Feliz*, 182 F.3d 82 (1999) (holding it was reasonable to conclude a regular drug trafficker possessed documents, cash, or other evidence of trafficking at his home); the Seventh Circuit, *United States v. McClellan*, 165 F.3d 535 (1999) (holding evidence that defendant was a drug dealer established appropriate nexus to search his home); the D.C. Circuit, *United States v. Thomas*, 989 F.2d 1252 (1993) (holding it reasonable to conclude evidence of a crime will be found at a suspect's residence based on the nature of the criminal activity away from the residence); the Fourth Circuit, *United States v. Williams*, 974 F.2d 480 (1992) (holding search of known drug dealer's motel room reasonable despite lack of direct evidence that room was used in drug activities); and the Ninth Circuit, *United States v. Terry*,

911 F.2d 272, 275 (1990) and *United States v. Angulo–Lopez*, 791 F.2d 1394, 1399 (1986) (stating "[I]n the case of drug dealers, evidence is likely to be found where the dealers live.").

The record clearly demonstrates Nunez was involved with heavy drug trafficking operations over the course of several months, involving large amounts of methamphetamine and tens of thousands of dollars in cash. Therefore, it was reasonable for the magistrate to issue a warrant to search for evidence of Nunez's drug trafficking activities at his Middleton residence. For the above reasons, the district court erroneously determined Warrant 1388 was not supported by probable cause.

### 4. Judge Hoff Acted Properly as a Neutral and Detached Magistrate.

For a search warrant to be valid, it not only must be based on sworn testimony and a valid determination of probable cause, but the judge issuing the warrant must also be neutral and detached. *See United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677, 692 (1984); *State v. Prestwich*, 115 Idaho 317, 766 P.2d 787 (Ct. App.1988). The district court found the magistrate did not act in a neutral and detached manner on December 6, 2000, when she took "judicial notice" of Montoya's prior testimony given at the probable cause hearing on November 16, 2000. The district judge based its conclusion in part on I.R.E. 201, which governs judicial notice of adjudicated facts. I.R.E. 201 provides for judicial notice of certain facts, which are either generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination. I.R.E. 201(b). In finding the magistrate erred, the district court noted (1) the magistrate did not have the necessary information, since she was never given a transcript or tape recording of the hearing and (2) the magistrate did not have a sufficient recollection of the previous testimony.

The central problem with the district judge's conclusion is that the Idaho Rules of Evidence do not apply to probable cause

hearings. I.R.E. 101. On this basis, Nunez argues Judge Hoff therefore lacked authority in taking judicial notice of the prior testimony. This argument is without merit. The Idaho Rules of Evidence do not confer authority but instead provide limitations and guidelines on judicial discretion. Thus, the fact that the Idaho Rules of Evidence do not apply to probable cause hearings simply means that Judge Hoff was not confined by these rules in exercising her discretion.

In "taking judicial notice" of the previous testimony, the magistrate was, in fact, simply stating that Montoya need not relate to her all of the information to which he had testified on November 16th, since she was present at this hearing and would consider the information in her probable cause determination. Perhaps the magistrate should not have used the term "judicial notice." However, it was entirely appropriate for her to consider the previous testimony, even if she did not have a transcript or tapes before her. Furthermore, in considering the previous testimony, Judge Hoff did not relinquish her role. Rather, as the transcript shows, she demonstrated sufficient memory of the previous hearing and maintained her neutral and detached character by asking questions and conducting an independent review of the facts presented before determining whether probable cause existed.

Judge Hoff did not fail to act in a neutral and detached manner simply by considering the testimony she had heard twenty days previously. Therefore, without further information, the district court erred in determining the warrant failed for lack of a neutral and detached magistrate.

## IV.

## CONCLUSION

The search warrant was valid and rendered the search of the Middleton residence reasonable; therefore, all evidence seized pursuant to such authority should not be excluded from evidence pursuant to the exclusionary rule. Therefore, it is unnecessary to consider the good faith exception to the exclusionary rule.

Justices SCHROEDER, WALTERS and EISMANN, concur.

Justice KIDWELL, specially concurring.

In reversing the district court's order of suppression, the majority finds the warrant was valid as issued. I concur fully in the analysis of the majority opinion, however, I feel this Court, as an alternative basis, should formally adopt the *Leon* "good faith" exception to Idaho's exclusionary rule. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In doing so, I would overrule or modify *State v. Guzman,* 122 Idaho 981, 992–93, 842 P.2d 660, 671–72 (1992) to the extent that case rejected the good faith exception under Idaho's exclusionary rule pursuant to Art. 1, § 17 of the Idaho Constitution.

In *Guzman,* this Court rejected the *Leon* good faith exception on the basis of the U.S. Supreme Court's narrow justification for the exclusionary rule, which is to deter police misconduct. *Id.* The *Guzman* Court ruled that the good faith exception was incompatible with Idaho's independent exclusionary rule because Idaho's exclusionary rule does much more than just deter police conduct. The *Guzman* Court recognized the purpose of the Idaho exclusionary rule is to: (1) provide an effective remedy to citizens whose constitutional right to be free from unreasonable search and seizure has been violated; (2) deter police misconduct in obtaining evidence; (3) promote care in the warrant issuing process; (4) avoid further constitutional violations by the judiciary due to further consideration of illegally obtained evidence; and (5) maintain judicial integrity. *Id.* Additionally, the *Guzman* Court rejected the good faith exception based on the *Leon* Court's reasoning that the decision to apply the exclusionary rule depends on whether the goal of police deterrence would be furthered. *Id.* The *Guzman* Court reasoned that regardless of whether police misconduct would be deterred by applying the exclusionary rule, it should always be applied in cases where evidence is seized illegally.

The good faith exception to the exclusionary rule prevents suppression of evidence seized in good faith reliance on a warrant, even if the warrant is not supported by probable cause in violation of the Fourth Amendment. *Id.* The *Leon* Court reasoned that in such a situation there was no police misconduct, and as a result, nothing to deter. *Id.* (citing *United States v. Leon,* 468 U.S. 897, 921, 104 S.Ct. 3405, 3419, 82 L.Ed.2d 677, 697 (1984)). The *Leon* Court further reasoned that since deterrence is the only justification for the exclusionary rule, it has no application in instances where the police did not act illegally. *Id.*

It is my position that adoption of the good faith exception would do no injury to any of the stated purposes of the Idaho exclusionary rule. Application of the good faith exception is limited in that it requires good faith reliance. Law enforcement officials may not recklessly procure a warrant and then hope it will be upheld based on the good faith exception. The good faith exception can be applied in cases where it is warranted without compromising the integrity of any of the stated purposes behind the Idaho exclusionary rule. Under Idaho's exclusionary rule, evidence obtained illegally will be suppressed, as the *Guzman* Court advocates. As a result, I would formally adopt the *Leon* good faith exception in order to clarify when evidence is not subject to exclusion, as in cases such as the one before the Court.