41 P.3d 275

STATE of Idaho,

v.

Elberteen PEARSON–ANDERSON.

Nos. 26467, 26468, 26469.

Court of Appeals of Idaho.

Dec. 14, 2001.

Review Denied Feb. 28, 2002.

Molly J. Huskey, Interim State Appellate Public Defender; Nancy C. Luebbert, Special Deputy Appellate Public Defender, Boise, for appellant. Nancy C. Luebbert argued.

Hon. Alan G. Lance, Attorney General; T. Paul Krueger II, Deputy Attorney General, Boise, for respondent. T. Paul Krueger II argued.

LANSING, Judge.

Elberteen Pearson–Anderson sought the suppression of evidence of methamphetamine obtained in a warrantless search of the home in which she was living. The district court denied Pearson–Anderson's motion, and she was convicted of trafficking in methamphetamine following a jury trial. Due to this offense, the district court also revoked Pearson–Anderson's probation in an unrelated case. In these consolidated appeals, Pearson–Anderson asks that we reverse the order denying her suppression motion and the order revoking probation.

1. At that time, Pearson–Anderson and Anderson were living together but were not married. They

## I.

### BACKGROUND

Shortly after midnight on August 21, 1999, a 911 emergency operator received a hang-up call. The operator traced the call to the home where Pearson–Anderson resided with her boyfriend, Gerald Michael Anderson.[1] When the operator telephoned that residence, someone picked up the telephone and then immediately hung up. The 911 operator alerted the Spirit Lake Police Department, which sent Officers Cotter and Giffin to investigate. When the officers arrived, they heard yelling and saw Pearson–Anderson and Anderson grappling with one another in the threshold of the backdoor to the home. The two were lying on the floor across the threshold, struggling with one another. The officers separated and frisked the two combatants. They found no weapons and, other than some general redness, discerned no visible marks on either person. Officer Giffin questioned Pearson–Anderson at the threshold to the home while Officer Cotter took Anderson some distance away for questioning.

When asked about the 911 call, Pearson–Anderson stated that she and Anderson had been fighting, and that when she tried to leave the home, Anderson prevented her from leaving. Pearson–Anderson said that she tried to call 911 to report the incident, but Anderson hung up the telephone before she could speak. She said that when the 911 operator called back, Anderson again hung up the phone. Giffin then asked Pearson–Anderson about the reason for the fight. Pearson–Anderson said the fight arose because Anderson had given a key to the home to another woman. According to Pearson–Anderson, the woman had entered the house with the key and damaged some of Pearson–Anderson's belongings. Pearson–Anderson told Giffin that the other woman was no longer in the home, but said that the other woman had been there "earlier."

subsequently married.

As Cotter was walking away with Anderson, he overheard Pearson–Anderson tell Giffin that she had called 911 because she was tired of Anderson pushing her around. Cotter began questioning Anderson about his version of the dispute. Anderson said nothing had occurred and that he was just trying to calm Pearson–Anderson down when the officers arrived.

After questioning Anderson, and about five minutes after Cotter and Giffin initially arrived at the scene, Cotter went into the home to determine if there were any third persons present. Cotter did not obtain a warrant or speak with Officer Giffin before entering the home. Giffin remained outside to supervise Pearson–Anderson and Anderson. Cotter testified at the suppression hearing that he entered the home in order to ascertain whether there were any third parties in need of assistance and for officer safety. He said that it was police department policy, when responding to a 911 hang-up call, to go through the premises to ensure the safety of all persons at the scene.

Immediately after entering the home, Cotter detected a strong chemical smell and Cotter saw in plain view chemicals and equipment. Cotter stayed in the home only two or three minutes. He then applied for a warrant to search the home for evidence of methamphetamine and production of methamphetamine. He supported the application with testimony about what he had seen and smelled during his warrantless entry. A warrant was issued, and the resulting search yielded evidence of a methamphetamine laboratory and a large quantity of methamphetamine.

Pearson–Anderson was charged with trafficking in methamphetamine, Idaho Code § 37–2732B(a)(4)(C). She moved to suppress the seized evidence as the fruit of an illegal warrantless search. The motion was denied and the case proceeded to trial. Pearson–Anderson was found guilty, and the district court sentenced her to a unified eight-year term of imprisonment with five years determinate.

In unrelated cases, Pearson–Anderson had been on felony probation for issuing insufficient funds checks, I.C. § 18–3106, and for forgery, I.C. § 18–3601. In those cases, the district court revoked Pearson–Anderson's probation because the trafficking conviction constituted a violation of her probation. It was ordered that her sentences in all three cases would run concurrent.

On appeal, Pearson–Anderson contends that the district court erred in denying her suppression motion and that her trafficking conviction therefore must be reversed. She also argues that because the trafficking judgment was the predicate for revocation of her probation in the forgery and bad check cases, the order revoking probation must also be reversed.

## II.

## ANALYSIS

Pearson–Anderson argues that the warrant that authorized the search of her home was invalid because it was issued on the basis of evidence acquired during Officer Cotter's warrantless entry of the home which, Pearson–Anderson argues, was unlawful. She disputes the district court's determination that Cotter's warrantless entry was justified by an exception to the warrant requirement.

■■■ The Fourth Amendment of the United States Constitution prohibits the government from engaging in warrantless searches and seizures. Therefore, an officer's warrantless entry into a home is presumed to be unlawful unless it falls within a well-recognized exception. *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619, 634 (1991); *Colorado v. Bannister*, 449 U.S. 1, 2–3, 101 S.Ct. 42, 43, 66 L.Ed.2d 1, 3–4 (1980); *State v. Holton*, 132 Idaho 501, 503–04, 975 P.2d 789, 791–92 (1999); *State v. Wiedenheft*, 136 Idaho 14, 16, 27 P.3d 873, 875 (Ct.App.2001); *State v. Sutherland*, 130 Idaho 472, 476, 943 P.2d 62, 66 (Ct.App.1997). The State here urges application of the exigent circumstances exception, which justifies a search when there is "compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486, 498 (1978). *See also Holton*, *supra*. Exigencies that justify a warrantless

entry include "the risk of danger to the police or to other persons inside or outside the dwelling." *Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85, 95 (1990). The test for application of this warrant exception is "whether the facts as then known to the police, together with reasonable inferences drawn therefrom, 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *State v. Monroe,* 101 Idaho 251, 254, 611 P.2d 1036, 1039 (1980) (quoting *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). This is an objective test, and it should be applied to the facts as known to the officers at the time of the warrantless entry. *Wiedenheft,* 136 Idaho at 16, 27 P.3d at 875. "While the claim of emergency must be scrutinized to insure that it is not mere pretext for entries and searches that otherwise fall under the requirement for a warrant, nonetheless courts should . . . avoid second-guessing police decisions made in legitimate belief that life may very well be at stake." *Monroe,* 101 Idaho at 255, 611 P.2d at 1040.

■ In this case, the district court held that the 911 hang-up call, combined with the circumstances observed by the officers when they arrived at Pearson–Anderson's home, justified the officer's entry of the house to assure the safety of anyone on the premises. Pearson–Anderson argues that this decision was in error because, before Officer Cotter went into the home, Pearson–Anderson had already explained to Officer Giffin that it was she who made the 911 call, that the reason for the call was her fight with Anderson, and that it was Anderson who hung up the telephone twice. She points out that the officers had already separated her from Anderson and terminated the combat. Therefore, she urges, there was no reason to believe that anyone inside the house was in need of help.

In addressing Pearson–Anderson's argument, we must determine whether the officer's entry was reasonable in light of the totality of the circumstances. Foremost among those circumstances is the fact that the police action was initiated by a 911 hang-up call. An emergency operator received a call that was terminated by someone before the caller could give any information to the operator. Moreover, a return call by the operator was similarly terminated by a person in the residence. These facts suggested that someone in the home who was in need of help had been prevented by another person from communicating with the operator. Then, when officers arrived at the scene, they found a violent situation with two persons wrestling on the floor.

We cannot agree with Pearson–Anderson's assertion that any questions or concerns arising from the 911 call were allayed by her explanation of the events, and that, as a consequence, any subsequent entry of the home was unreasonable. First, Anderson's explanation itself referred to a third person (the other woman) who had been in the home and whose actions were reportedly the cause of the fight. This raised the possibility of third-party involvement. Second, Anderson essentially asks for a ruling that where a 911 hang-up call has been received, responding officers must take the word of a person at the scene who offers a plausible explanation for the hang-up and assures officers that all is now safe and calm. Such a rule would not well serve the interest of public safety. In our view, 911 hang-up calls are qualitatively different from ordinary emergency calls in which the caller communicates with the operator. In the latter circumstance, responding officers ordinarily know, at a minimum, the gender of the caller and something about the nature of the emergency. With this information, officers who have responded can discern whether the reported emergency is under control and whether they have communicated with the person who was in need of help. The same cannot be said when the 911 call has been disconnected before there is any communication with the operator. When responding to a 911 hang-up call, officers may reasonably be cautious about concluding that the need for help has dissipated based solely upon an explanation from whoever greets them upon their arrival.

■ A Fourth Amendment analysis inherently entails the balancing of the defendant's privacy interest against the governmental need for the action that was taken. *State v. Henderson,* 114 Idaho 293, 304–05, 756 P.2d

1057, 1068–69 (1988); *State v. Reed,* 129 Idaho 503, 505, 927 P.2d 893, 895 (Ct.App.1996); *State v. Rusho,* 110 Idaho 556, 558, 716 P.2d 1328, 1330 (Ct.App.1986). In the case of a 911 hang-up call, there is a heavy governmental interest in assuring that the danger or distress which prompted the call has been discovered and resolved by responding officers. Additionally, in this balancing process, we cannot ignore the fact that by making the 911 call, Pearson–Anderson herself diminished her reasonable expectation of privacy within her home by summoning police officers to the premises with an implied representation that an emergency was occurring. Considering all of the circumstances presented in this case, we conclude that the State met its burden to show that the exigent circumstance exception to the warrant requirement applied to Officer Cotter's entry of Pearson–Anderson's home, and we therefore affirm the district court's denial of her suppression motion.

Because Pearson–Anderson's challenge to the probation revocation in her forgery and bad check case was pendent to her suppression argument in the trafficking case, her argument for reversal of the probation revocation order also fails.

The district court's orders denying Pearson–Anderson's motion to suppress evidence and the orders revoking her probation are affirmed.

Judge PERRY Concurs.

Chief Judge SCHWARTZMAN, Specially Concurring.

I write separately in this case, just as I did in *State v. Wiedenheft,* 136 Idaho 14, 17–18, 27 P.3d 873, 876–77 (Ct.App.2001), to again voice my "constitutional concern" that domestic violence cases do not, *ipso facto,* give the police *carte blanche* to conduct a general exploratory search or protective sweep of the entire premises in every case as a matter of standard operating procedure. Indeed, even the State, at oral argument, *conceded* that it was NOT asking for or advocating any such bright-line rule, despite the fact Officer Cotter testified that it was his Chief's "standing policy" to do so in every 911 hang-up case.

But as I also noted in *Wiedenheft,* the police there (and here) had reasonable grounds to lawfully detain and further question the alleged "victim" (now defendant) on the rational suspicion and exigency that she was connected with a domestic altercation and violence of some kind and needed help. Whether this investigation should continue on the threshold of Pearson–Anderson's mobile home or inside the front door/living room is not a matter of constitutional imperative for me: either would suffice and not offend the Fourth Amendment of the Constitution. After all, it was Pearson–Anderson herself who attempted to call the police and ask for assistance; as such, she impliedly or implicitly consented to a *limited* initial entry/intrusion into her jointly occupied mobile home for police to complete an investigation and calm the situation. Once over the threshold, the officer quickly detected the chemical stench and plain view apparatus of drug manufacturing equipment.

Where I would draw the constitutional line, here as well as in *Wiedenheft,* is in prohibiting police from trooping through every room in the household at any hour of the day or night in the absence of articulable, reasonable suspicion involving "officer safety" or searching for other "victims." By analogy, I would advocate a *Buie I/Buie II* type analysis in each case. *See Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Thus, where police are called upon to investigate a case of domestic violence, I would permit the police, incident to that investigation and as a precautionary measure, to conduct a Type I *Buie* cursory search of the immediate area adjoining the place of investigation. However, in order to conduct a more expansive Type II *Buie* search, there must be articulable facts which, when taken together with the rational inferences from those facts, would warrant a reasonable and prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the scene *or* harbors an additional victim or victims. *See State v. Slater,* 133 Idaho 882, 886, 994 P.2d 625, 629 (Ct.App. 1999) (quoting *Buie,* 494

U.S. at 334, 110 S.Ct. at 1098, 108 L.Ed.2d at 286).

Given the fact that a *Buie I* search in this case would have turned up the same incriminating evidence leading to the issuance of a search warrant, and the resulting evidence of drug trafficking, I concur in the result reached by this Court and would affirm the denial of Pearson–Anderson's motion to suppress.