**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 34399**

|  |  |  |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2008 Opinion No. 68** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: July 14, 2008** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| ERIC A. REYNOLDS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. Fred M. Gibler, District Judge.

Order denying motion to suppress evidence, <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender; Elizabeth A. Allred, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Thomas Tharp, Deputy Attorney General, Boise, for respondent.

_____

LANSING, Judge

Eric A. Reynolds appeals from his judgment of conviction on various drug-related charges. He argues that the district court erred in denying his motion to suppress evidence found during a warrantless search of his home. We affirm.

**I.**

**BACKGROUND**

At approximately 10 p.m., three police officers were dispatched to the home of Eric and Melissa Reynolds to investigate a telephoned report from Melissa's mother that Reynolds was holding Melissa against her will. The officers arrived simultaneously and saw Reynolds standing just outside of the front door, which was ajar. Two of the officers approached Reynolds and began to question him about the reported altercation. In the meantime, a third officer, Officer Harmon, entered the home through the partially-opened front door. He did not hear any noises coming from the house, nor did he first knock, announce his presence, or call for Melissa.

1

Upon entering, Officer Harmon saw Melissa standing in the living room about ten feet from the door. She was visibly upset. She said that Reynolds had pushed her onto the couch and also restrained her when she was trying to leave the bedroom. A few minutes after entering, Officer Harmon smelled an odor that he believed to be marijuana. He questioned Melissa about the scent, and she said that there was marijuana in another room. Officer Harmon then motioned the two other officers, Farina and Hicks, into the house. Officer Farina asked Melissa if there were any weapons or other people in the home. She said there were no other people in the house, and directed Officer Farina down a hallway to an office which contained a handgun as well as a large plywood box or closet that was approximately four feet long, four feet wide, and six feet tall. Officer Farina then requested and received Melissa's consent to search the home. She told the officer that the large plywood box, which was locked, belonged to Reynolds. Melissa told the officer that she did not have the key to unlock the closet and that it was probably on Reynolds' key ring. Nonetheless, the two began to search the office for a key that would open the closet. Melissa pointed to a key ring hanging on the wall and instructed Officer Farina to try the key. It opened the plywood box, and the officer saw within marijuana plants and grow lamps. At some point--whether before or after opening the box is unclear--Officer Farina also observed in another room marijuana hanging from the ceiling to dry.

Reynolds was charged with manufacturing a controlled substance, Idaho Code § 37-2732(a); possession of marijuana in excess of three ounces, I.C. § 37-2732(e); domestic battery, I.C. § 18-918(3)(b); and possession of drug paraphernalia, I.C. § 37-2734A. He filed a motion to suppress the evidence found in the house, arguing that his Fourth Amendment rights were violated when the officers entered the home and that Melissa did not have authority to consent to a search of his locked plywood box. The district court denied the motion, finding that exigent circumstances justified the officers' entry into the home and that Melissa had at least apparent authority to consent to a search of the box. Reynolds conditionally pleaded guilty to possession of marijuana in excess of three ounces and domestic battery in exchange for the State's agreement to dismiss the remaining charges and to recommend concurrent sentences. Reynolds now appeals the denial of his suppression motion.

## II.

## DISCUSSION/ANALYSIS

### A.      Standard of Review

In reviewing a decision to grant or deny a motion to suppress evidence, this Court defers to the trial court's findings of fact unless they are clearly erroneous. *State v. Hawkins*, 131 Idaho 396, 400, 958 P.2d 22, 26 (Ct. App. 1998). The determination whether a search is reasonable, and therefore complies with the Fourth Amendment, is a question of law, however, over which we exercise free review. *State v. Bunting*, 142 Idaho 908, 912, 136 P.3d 379, 383 (Ct. App. 2006).

### B.      The Entry Was Illegal

Reynolds argues that the evidence discovered during the search of his home must be suppressed because the police illegally entered the house without a warrant or other lawful justification in violation of the Fourth Amendment to the United States Constitution. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313 (1972). *See also Payton v. New York*, 445 U.S. 573, 589-90 (1980); *State v. Johnson*, 110 Idaho 516, 523, 716 P.2d 1288, 1295 (1986); *State v. Robinson*, 144 Idaho 496, 498-99, 163 P.3d 1208, 1210-11 (Ct. App. 2007). Such entries and other searches conducted without a warrant are presumed to be unreasonable, *United States v. Leon*, 468 U.S. 897, 960 (1984); *State v. Martinez*, 129 Idaho 426, 431, 925 P.2d 1125, 1130 (Ct. App. 1996), but there are a few carefully delineated exceptions to this presumption. *Leon*, 467 U.S. at 960-61; *State v. Brauch*, 133 Idaho 215, 218, 984 P.2d 703, 706 (1999). The State bears the burden to show that a warrantless search fell within one of these well-recognized exceptions to the warrant requirement or was otherwise reasonable under the circumstances. *Martinez*, 129 Idaho at 431, 925 P.2d at 1130.

The State argues here that the officers' warrantless entry into Reynolds' home was permissible under the exigent circumstances exception, which allows for warrantless searches by state agents when there is compelling need for official action and no time to secure a warrant. *Michigan v. Tyler*, 436 U.S. 499, 509 (1978); *State v. Barrett*, 138 Idaho 290, 293, 62 P.3d 214, 217 (Ct. App. 2003); *State v. Sailas*, 129 Idaho 432, 434, 925 P.2d 1131, 1133 (Ct. App. 1996).

3

The test for application of this warrant exception is whether the facts known to the agent at the time of entry, together with reasonable inferences, would warrant a reasonable belief that an exigency justified the intrusion. *Barrett*, 138 Idaho at 293, 62 P.3d at 217. A law enforcement officer's reasonable belief of danger to the police or to other persons inside or outside the dwelling is one type of exigency that may justify a warrantless entry. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990); *Bunting*, 142 Idaho at 912-13, 136 P.3d at 383-84. Thus, the necessity to protect or preserve life or avoid serious injury will legitimize an otherwise illegal intrusion. An example of such an exigency is found in *Sailas*, 129 Idaho 432, 925 P.2d 1131, where an officer responded to a report of a domestic disturbance. As the officer approached the apartment, she could hear yelling and screaming. The officer knocked on the door. The victim, who had blood on her nose and hands, answered the door and said that she did not need the assistance of the police. The defendant continued shouting at the victim throughout this conversation, and the officer could also see a child in the house. The officer then entered the apartment, and the defendant later contended that the entry was unlawful. We held that exigent circumstances justified the entry because the volatile circumstances suggested that there was a risk of further injury to the victim or injury to the child if the police waited to secure a warrant before entering the defendant's apartment.

Another illustrative case is *State v. Pearson-Anderson*, 136 Idaho 847, 41 P.3d 275 (Ct. App. 2001), which began when a 911 emergency operator received a hang-up call. The operator traced the call to the home where Pearson-Anderson resided with her boyfriend. When the operator telephoned that residence, someone picked up the telephone and then immediately hung up. The 911 operator alerted police who went to the home to investigate. When they arrived, they heard yelling and saw Pearson-Anderson and her boyfriend lying on the floor across the threshold, struggling with one another. The officers separated the two and questioned them. Pearson-Anderson said that she had made the 911 call because the boyfriend was preventing her from leaving the home, and he hung up the telephone before she could speak. She said that the boyfriend also hung up the telephone when the 911 operator called back. When asked about the reason for the fight, Pearson-Anderson said it arose because the boyfriend had given a key to the home to another woman who had been in the home earlier but was not currently there. One of the officers then went into the home to determine whether there were any third persons in need of help. That officer found evidence of methamphetamine manufacturing, for which Pearson-

Anderson was ultimately arrested. We held that the officers' warrantless entry of the home was justified by the 911 hang-up call and rejected Pearson-Anderson's assertion that any concerns arising from that call were laid to rest by her explanation of the events. We noted that Pearson-Anderson's own explanation referred to a third person (the other woman) who had been in the home and whose actions were reportedly the cause of the fight, raising the possibility of third-party involvement. We also said that where a 911 hang-up call had been received, responding officers were not required to simply take the word of a person at the scene who offers a plausible explanation and assures the officers that all is well. We explained:

> In our view, 911 hang-up calls are qualitatively different from ordinary emergency calls in which the caller communicates with the operator. In the latter circumstance, responding officers ordinarily know, at a minimum, the gender of the caller and something about the nature of the emergency. With this information, officers who have responded can discern whether the reported emergency is under control and whether they have communicated with the person who was in need of help. The same cannot be said when the 911 call has been disconnected before there is any communication with the operator. When responding to a 911 hang-up call, officers may reasonably be cautious about concluding that the need for help has dissipated based solely upon an explanation from whoever greets them upon their arrival.

*Id.* at 850, 41 P.3d at 278.

In this case, the only factor that suggested a possible exigency was the report that Reynolds' wife was being held against her will. By the time the officers arrived, however, Reynolds was standing outside the house, and the front door was ajar. With the couple thus separated, it was apparent that if there was a woman in the house, she was under no immediate risk of harm from Reynolds while he was outside being questioned by an officer. Therefore, there was no exigency that would justify entry into the house without first knocking or calling out to bring any occupant to the door where she could be interviewed and the situation assessed. If Officer Harmon had first knocked or called out to occupants and received no response, the telephoned report of a woman being held against her will could have justified a warrantless entry to ensure that there was no one in the house who was physically restrained or too frightened to respond to the officers, but that did not occur.

This situation should be contrasted to that in *Barrett*, 138 Idaho 290, 62 P.3d 214, where police were dispatched to a home on a report of a medical emergency. They encountered a man outside the home, in physical distress, incoherent, and unable to communicate the cause of his medical condition. A neighbor informed the police that the man had several family members

5

who lived at the house but had not been seen all day. Officers shouted for any family members, but received no response, and so entered the home. We held that this entry was justified by exigent circumstances, noting that the unexplained medical emergency, *coupled with the officers' inability to contact anyone in the home*, suggested a reasonable possibility that other occupants in the home were also in distress.

In the present case, there was no attempt by police officers to contact the alleged victim through non-intrusive means such as knocking or calling out for her, and the surrounding circumstances did not suggest an *immediate* danger that would justify dispensing with an effort to bring someone to the door to be interviewed. Had the latter action been taken, the officers' interview of Melissa could have either supported or dispelled the report that she was being held against her will. If the results of that interview left officers concerned that there could still be an individual in danger inside the house, and if permission to search could not be obtained from Reynolds or Melissa, perhaps a warrantless entry would have been justified. But in the circumstances as they are presented to us, there was no appearance of an immediate risk of harm sufficient to excuse the officers from the normal procedure of knocking or calling out to bring someone to the doorway for questioning. The circumstances here did not support a reasonable belief that immediate entry into the home was necessary.

## C.     Melissa's Consent to a Search Was Valid

Notwithstanding the illegality of this initial entry, the State argues that evidence found in the home should not be suppressed because Melissa's subsequent consent to the officers' further intrusion into the home and the ultimate opening of the plywood box authorized and legitimized the officers' search and discovery of the marijuana.

A voluntary consent to a search, given by either the defendant or a third party with authority over the place or item to be searched, will exempt a search from the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *State v. Stewart*, 145 Idaho 641, 644, 181 P.3d 1249, 1252 (Ct. App. 2008). The burden of proving that consent has been given, and that the person giving the consent had authority to do so, is on the State. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *State v. Abeyta*, 131 Idaho 704, 708, 963 P.2d 387, 391 (Ct. App. 1998); *Johnson*, 110 Idaho at 522, 716 P.2d at 1294; *State v. Huskey*, 106 Idaho 91, 93, 675 P.2d 351, 353 (Ct. App. 1984).

6

If the consent was preceded by police conduct that violated the accused's constitutional rights, however, the State must also prove that the consent was not procured by exploitation of the previous illegality. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *State v. Tietsort*, 145 Idaho 112, 175 P.3d 801 (Ct. App. 2007). In such a circumstance, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488. Whether the connection between the illegal police conduct and the discovery of evidence is sufficiently attenuated to allow use of the evidence against the defendant requires consideration of three factors: (1) the elapsed time between the misconduct and the acquisition of the evidence, (2) the occurrence of intervening circumstances, and (3) the flagrancy and purpose of the improper law enforcement action. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *State v. Page*, 140 Idaho 841, 846-47, 103 P.3d 454, 459-60 (2004).

Accordingly, to determine whether the evidence found in Reynolds' home must be suppressed, we must determine whether Melissa's consent to the officers' further intrusion into the home and search of the box was voluntary; whether Melissa possessed authority to authorize the officers' intrusion into all of the areas that were searched; and whether the three *Brown* factors indicate that the connection between the officers' unlawful entry and Melissa's consent was sufficiently attenuated that the consent was untainted.

### 1. Voluntariness of consent

Here, two forms of consent were given, the first being implied. The implied consent occurred when, in response to Officer Farina's question whether there were any weapons in the home, Melissa directed the officer down a hallway and into another room to show where a handgun was located. The express consent occurred thereafter when Farina requested, and Melissa gave, consent to a search of the home. Whether a consent to a search was voluntary is an issue of fact, and we therefore defer to the trial court's findings as to voluntariness. *Tietsort*, 145 Idaho at 119, 175 P.3d at 808; *State v. Jaborra*, 143 Idaho 94, 97-98, 137 P.3d 481, 484-85 (Ct. App. 2006). Here, the district court found that Melissa's consents were voluntary, and the evidence fully supports that finding. First, we note that although the officers' unlawful entry violated the constitutional rights of Melissa, who was a resident of the home, as well as those of Reynolds, nothing in the record suggests that she found their entry objectionable. To the

7

contrary, she acknowledged that she was the victim of the domestic disturbance that the officers were there to investigate and, so far as appears from the record, she welcomed the police presence and was happy to cooperate. She took the initiative in directing Officer Farina down the hallway and into the office where the gun was located, and the police employed no coercive tactics either then or thereafter when they requested her express consent for a larger search.

### 2. Melissa's authority to consent

The next question is whether Melissa possessed authority to consent to the search. As noted above, a third party's consent to a search will relieve government agents of the warrant requirement only if the person possessed authority to provide such a consent. Actual authority exists if the consenting party shares with the defendant common authority over the place searched. Such common authority generally is shared by co-habitants of a residence. The United States Supreme Court has explained:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent . . . rests . . . [up]on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). *See also State v. Ham*, 113 Idaho 405, 744 P.2d 133 (Ct. App. 1987) (mother had access to rent-paying son's room sufficient to give her authority to consent to search). As we noted in *Brauch*, 133 Idaho at 219, 984 P.2d at 707, married couples generally have common authority over the premises they share.

In this case, Melissa was married to Reynolds and shared the residence with him. She plainly possessed actual authority to consent to Officer Farina's walk from the living room into the office where he saw the handgun and the large box, and to grant his subsequent request to search throughout the house.

The question of Melissa's authority to permit the officers to open the big box in the office is more problematic. Common authority over shared premises does not necessarily translate into authority to search specific containers. That is, "The shared control of 'host' property does not serve to forfeit the expectation of privacy in containers within that property." *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993), *overruled on other grounds United States v. Kim*, 105 F.3d 1579 (9th Cir. 1997). *See also United States v. Davis*, 332 F.3d 1163 (9th Cir. 2003)

8

(housemate did not have authority to consent to search of gym bag under defendant's bed); *United States v. Block*, 590 F.2d 535 (4th Cir. 1978) (mother did not have authority to consent to search of locked trunk when she said it belonged to defendant and she did not have key to open it). *United States v. Davis*, 967 F.2d 84 (2nd Cir. 1992) (individual had common authority to consent to search of his footlocker that he allowed defendant to store items in, even though defendant had only genuine key); *United States v. Salinas-Cano*, 959 F.2d 861 (10th Cir. 1992) (girlfriend lacked authority to consent to search of suitcase left in girlfriend's apartment by defendant, who stayed there several nights a week, where girlfriend expressly denied ownership). Even a spouse may not have actual authority to consent to a search of property owned by the other if the spouse has no right or ability to control or access the item. *Cf. United States v. Duran*, 957 F.2d 499 (7th Cir. 1992) (wife could consent to search of outbuilding that she did not use when nothing prevented her from using it); *United States v. Harrison*, 679 F.2d 942 (D.C. Cir. 1982) (wife had common authority to consent to search of boxes containing husband's personal property in unlocked storage area in basement when boxes were not sealed and did not in any way indicate husband's exclusive ownership or control).

In the absence of actual authority, a search nevertheless may be valid if, based on the information known at the time, the law enforcement officer had an objectively reasonable belief that the consenting party possessed authority over the place to be searched. *Rodriguez*, 497 U.S. at 188; *Brauch*, 133 Idaho at 219, 984 P.2d at 707; *State v. McCaughey*, 127 Idaho 669, 674, 904 P.2d 939, 944 (1995); *State v. Hawkins*, 131 Idaho 396, 400, 958 P.2d 22, 26 (Ct. App. 1998). For example, in *McCaughey*, the victim was temporarily living with her husband after a period of separation and was in the process of moving her things from the home. After a domestic violence incident, she consented to a search of the home. The husband had taken steps to keep her out of the shed and basement, but the officer was not aware of these details of the living arrangement. Prior to the search, the officer had been told that the victim was married to the defendant and lived in the house. Additionally, the victim's property was at the house, and the victim produced the keys to the locked basement and shed. Under these circumstances, where nothing suggested to the officer that the victim's dominion and control over any part of the house was limited, the Supreme Court held that the victim had apparent authority to consent to a search. Likewise, in *United States v. Ruiz*, 428 F.3d 877 (9th Cir. 2005) it was held that the occupant of a trailer had apparent authority to consent to the search of a gun case on a shelf in

9

the living room when the occupant answered questions about the case without disclaiming control over it. And in *White v. United States*, 444 F.2d 724 (10th Cir. 1971) a woman holding herself out as the defendant's wife was deemed to possess authority to consent to the search of a cloth bag when she neither objected to the search nor indicated to officers that the bag was exclusively the defendant's property.

In this case, Melissa disclaimed ownership of the plywood box and told officers that she did not want it in the house. She also told Officer Farina that she seldom went into the room with the box, but she did not indicate to the officers that Reynolds had forbidden her to open the box or prevented her from accessing its contents. There is no evidence that she lacked the right or ability to access or use the box. Although the box was locked and Melissa did not immediately know exactly where the key was located, it was quickly found hanging on the wall in the same room where the box was situated. The officers knew that the box was located in the marital home that Melissa shared with Reynolds and that she could readily access it by simply finding the correct key on a ring of keys located nearby. Absent any evidence that the officers knew that Reynolds had attempted to forbid or prevent Melissa's access to the box, the officers were justified in a belief that Melissa had authority to consent to their search of the box's interior. The evidence supports the district court's finding that Melissa had at least apparent authority to consent to the search of the box.

### 3. Attenuation of taint from the illegal entry

Lastly, we turn to the attenuation question--whether Melissa's consent was "fruit of the poisonous tree," i.e., a product of the unlawful entry. The finding that Melissa's consent was voluntary is important, but not decisive, in this inquiry. As noted above, there is a three-part test to determine whether there was a sufficient break in the causal chain between the unlawful conduct and the discovery of challenged evidence. The first of the three factors to be considered is the lapse of time between the police misconduct and Melissa's consent. In this case, that time period was very brief, which militates against a finding of attenuation.

The other two factors, however, weigh in favor of attenuation. First, the warrantless entry into the Reynolds' home without a warrant or permission was not a particularly egregious Fourth Amendment violation. The officer did so in the belief that someone may have been held against her will in the house. He entered not for a calculated purpose of trying to discover evidence of a crime, but rather to determine the location and well-being of an alleged victim of a

10

domestic disturbance. Having entered, he went only a few feet inside before making contact with Melissa, and she consented to any further intrusion. Finally, the unsolicited and entirely self-initiated nature of Melissa's invitation for an officer to walk into the office to see the gun, and her personal willingness to cooperate with the officers, is an intervening circumstance that separates the consent from the violation of Reynolds' constitutional rights that occurred when the police entered. Apart from the temporal proximity, there is no evidence in the record that Melissa's cooperation and consent were products of the unlawful entry. Nothing indicates that she was intimidated by the officers' unannounced entry. The only information that the officers gained by their initial unlawful entry was the scent of marijuana, but that was not the reason that Melissa showed Officer Farina around the house. Rather, she led him into the office in response to the officer's question about the presence of weapons, a legitimate inquiry considering that the purpose of the visit was to investigate a domestic disturbance. Weighing all of the factors that are to be considered in an attenuation analysis, we conclude that Melissa's consent was not acquired by exploitation of the illegality but, instead, "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488.

Because the consent was given voluntarily by someone with apparent authority and was not tainted by the officers' initial unlawful entry into Reynolds' home, the district court properly refused to suppress the evidence found.

### III.
### CONCLUSION

Although the officers' initial entry into Reynolds' home was unlawful, the district court correctly denied his suppression motion. The evidence shows that Melissa voluntarily consented to the officers' search of her home and the large box within it, that she had actual or apparent authority to do so, and that her consent was not tainted by the officers' prior unlawful entry into the house. Therefore, the order denying Reynolds' motion to suppress evidence is affirmed.

Chief Judge GUTIERREZ and Judge PERRY **CONCUR.**