**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 38691**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2012 Unpublished Opinion No. 679 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: October 17, 2012 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| DANIEL AARON LIGON-BRUNO, | ) | THIS IS AN UNPUBLISHED |
| | ) | OPINION AND SHALL NOT |
| Defendant-Appellant. | ) | BE CITED AS AUTHORITY |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. Lansing L. Haynes, District Judge.

Order denying motion to suppress, <u>affirmed</u>.

Sara B. Thomas, State Appellate Public Defender; Spencer J. Hahn, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent.

PERRY, Judge Pro Tem

Daniel Aaron Ligon-Bruno appeals from the judgment of conviction entered upon his conditional guilty plea to destruction, alteration, or concealment of evidence. Specifically, Ligon-Bruno challenges the district court's denial of his motion to suppress. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

The district court found the following facts and set forth its conclusions of law orally at a hearing on October 1, 2010. Shortly after midnight on January 4, 2010, officers responded to a "burglary in progress" call at an apartment complex on Wyoming Avenue in Hayden, Idaho. The reporting party who had called 911 stated that he or she had observed a male crawl through an exterior window into apartment 6, open the front door and unscrew the front light bulb to make the area dark, and then reenter the residence through the door. The police were aware of this particular apartment building due to multiple previous calls to the police department

1

regarding drugs, domestic violence, and thefts involving these apartments. As the officers approached the apartment building, the suspect reportedly was leaving the apartment. Officers detained this individual who was eventually identified as Gerard Steger. Steger appeared to be highly intoxicated and had no identification on his person to verify his claim that he lived at the apartment. Steger gave inconsistent responses to questions by the officers concerning whether there were any other occupants in the apartment.

During the questioning of Steger, two officers went to the apartment, which was located on the second floor, to further investigate. The officers noticed the front window was partially opened and covered by mini-blinds. They observed a small infrared-type security camera positioned between the slats of the blinds. The lights were on in the apartment and the officers could hear voices and other noises coming from inside. The officers knocked loudly on both the front door and the front window announcing their presence as law enforcement officers; however, they received no response from anyone inside the apartment.

Having received no response, one officer returned to speak further with Steger about whether there were any other occupants in the apartment. Steger continued to give conflicting answers, first denying that there was anyone else in the apartment with him, then admitting that his roommates might be inside, and then again denying that anyone else was present. While the officer was questioning Steger, two other officers maintained security at the front of the apartment. The officers continued to knock and announce their presence during which time they could hear voices coming from within the apartment. One officer testified that he heard what sounded like items being moved around inside the apartment.

In response to this activity, the officers slid open the front window and pushed aside the blinds to get a clear view of the inside of the apartment. The officers again announced their presence and ordered any occupants out of the apartment. At this time, Ligon-Bruno peeked his head out around the corner of the hallway inside the apartment and asked what the officers were doing there. His eyes were bloodshot and glassy and he appeared to be under the influence of something. At one officer's direction, Ligon-Bruno exited the apartment through the front window and was detained in handcuffs. Upon questioning by the officers, Ligon-Bruno indicated that "Luca was still in the apartment" and thereafter another individual identified as Luca Trentino emerged from the hallway. Trentino exited the apartment through the front window and was also detained in handcuffs.

2

One of the officers entered the apartment and conducted an initial protective sweep looking for any other individuals who may still be in the apartment. During this sweep, the officer noticed in plain view burnt marijuana cigarettes, rolling papers, a homemade marijuana pipe, numerous weapons, a pile of watches and other jewelry, and various small electronics. The apartment smelled of burnt marijuana and the sound of a toilet continuously running could be heard.

After conducting the initial sweep, officers brought the suspects back inside the apartment. Ligon-Bruno claimed to live in the apartment and identified several items of property as belonging to him. While one officer questioned Ligon-Bruno, a second officer conducted a more thorough sweep of the apartment, opening closet doors to make sure nobody else was hiding in the apartment. Because the water in the toilet continued to run and being concerned about the potential destruction of evidence, the officer lifted the lid on the tank of the toilet and observed several bags of suspected controlled substances.

After this second sweep, the officers discovered that Ligon-Bruno was on felony probation for a cocaine offense. The officers contacted a probation office supervisor and advised him of the circumstances. The probation officer then asked the officers to conduct a thorough search of the apartment. Upon doing so, the officers found additional items consistent with the use and sale of methamphetamine. At this time, the officers retrieved the contents of the toilet tank which included two digital scales, needles, spoons, scraper, straws, and approximately 200 small plastic baggies.

The State charged Ligon-Bruno with possession of a controlled substance with the intent to deliver. Ligon-Bruno moved to suppress all evidence against him arguing, inter alia, that the warrantless search of his home violated the United States Constitution and the Idaho Constitution. Following briefing and argument on the motion, the district court granted the motion to suppress relating to the contents of his cell phone, but denied the motion in all other respects. As is relevant to this appeal, the district court found that the initial entry of the apartment was justified by exigent circumstances and as a protective sweep. The district court also found that the second protective sweep of the apartment was not a reentry, but a constitutionally permissible continuation of the first sweep and that the lifting of the toilet lid during the continued sweep was justified as an exigent circumstance. Lastly, the district court

found that the search of the apartment pursuant to the probation officer's request was "constitutionally supportable under the probation search exception to the warrant requirement."

After the district court entered its order on Ligon-Bruno's suppression motion, the State amended its information to charge Ligon-Bruno with felony destruction, alteration, or concealment of evidence. Ligon-Bruno then entered a conditional guilty plea to the amended charge, reserving the right to appeal the district court's order denying his motion to suppress. The district court accepted the plea and imposed a unified four-year sentence, with two years determinate. The district court ultimately suspended the sentence and placed Ligon-Bruno on probation for three years. Ligon-Bruno timely appeals.

## II.

## DISCUSSION

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

### A. Warrantless Entry

In denying Ligon-Bruno's motion to suppress, the district court first found that there were exigent circumstances justifying the officer's warrantless entry into the residence. The district court noted that:

> This Court is going to specifically find as a conclusion of law that that was not an illegal entry by the sheriff's deputies but that in fact this was an exception to the warrant requirement of an exigent circumstance. At this point the police did not know whether the man who was leaving the apartment belonged there. The police did not know whether there was a burglary going on in process. They did not know whether there were further perpetrators of a possible burglary within that apartment. They did not know whether there were potential victims of serious crime within that apartment who needed immediate and serious care of law enforcement. They had exigent circumstances to enter that apartment and find out if their presence was needed for very serious reasons for the safety of citizens' ongoing safety.

4

The Fourth Amendment, as well as Article I, § 17 of the Idaho Constitution, protects the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. The United States Supreme Court has held that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. District Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972). *See also State v. Araiza*, 147 Idaho 371, 374, 209 P.3d 668, 671 (Ct. App. 2009); *State v. Reynolds*, 146 Idaho 466, 469, 197 P.3d 327, 330 (Ct. App. 2008). Such entries and other searches conducted without a warrant are presumed to be unreasonable, *Payton v. New York*, 445 U.S. 573, 586 (1980); *State v. Martinez*, 129 Idaho 426, 431, 925 P.2d 1125, 1130 (Ct. App. 1996), but there are a few carefully delineated exceptions to this presumption, *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971); *State v. Brauch*, 133 Idaho 215, 218, 984 P.2d 703, 706 (1999). The State bears the burden to show that a warrantless search either fell within one of these well-recognized exceptions to the warrant requirement or was otherwise reasonable under the circumstances. *Reynolds*, 146 Idaho at 470, 197 P.3d at 331; *Martinez*, 129 Idaho at 431, 925 P.2d at 1130.

Here, the district court held that the officers' warrantless entry into the residence was permissible under the exigent circumstances exception, which allows for warrantless searches by state agents when there is compelling need for official action and no time to secure a warrant. *Michigan v. Tyler*, 436 U.S. 499, 509 (1978); *Reynolds*, 146 Idaho at 470, 197 P.3d at 331. The test for application of this warrant exception is whether the facts known to the agent at the time of entry, together with reasonable inferences, would warrant a reasonable belief that an exigency justified the intrusion. *Reynolds*, 146 Idaho at 470, 197 P.3d at 331; *State v. Barrett*, 138 Idaho 290, 293, 62 P.3d 214, 217 (Ct. App. 2003). A law enforcement officer's reasonable belief of danger to the police or to other persons inside or outside the dwelling is one type of exigency that may justify a warrantless entry. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990); *Reynolds*, 146 Idaho at 470, 197 P.3d at 331. Thus, the necessity to protect or preserve life or avoid serious injury will legitimize an otherwise illegal intrusion. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. *Id.*

Idaho appellate courts have addressed numerous cases where the State argued that exigent circumstances--specifically the safety of persons inside a residence--justified a warrantless entry into a residence. In *State v. Rusho*, 110 Idaho 556, 716 P.2d 1328 (Ct. App.

5

1986), this Court held that exigent circumstances did not exist when police received a call from the defendant's neighbor that the defendant believed an intruder was in her residence. While waiting for the police to arrive, another neighbor and the defendant both entered and exited the house and encountered no intruder. When an officer arrived, he spoke momentarily with the neighbor who told him that the house had been checked and no intruder found, however the officer did not speak with the defendant and entered the residence. A second officer arrived and the defendant allegedly told him that "there is nobody in there, just forget it." Nevertheless, he entered the residence, where drugs were found. We held that to overcome a homeowner's right to tell the officer not to enter, there must exist a belief that an intruder actually exists and it must reasonably appear that persons are in immediate danger as a result. In this case, we reasoned there was no longer an immediate danger as three people had entered and exited the residence without incident. *Id.* at 560, 716 P.2d at 1332.

Conversely, this Court has also found the existence of exigent circumstances validating a warrantless search of a residence. In *Barrett*, 138 Idaho at 290, 62 P.3d at 214, Barrett's neighbor called 911 when he heard a crash from next door and found Barrett on the porch on his knees, indicating that he may have had a heart attack. When an officer arrived on the scene, the front door was wide open and Barrett was lying incoherent outside. He did not respond to any of the officer's inquiries, including whether there were other persons in the residence. The neighbor indicated that other family members lived in the house, but that he had not seen them all day. Several officers loudly identified themselves multiple times, asking any persons inside to come to the front door, but getting no response and hearing nothing from inside, the officers entered the residence and found drugs and paraphernalia in plain view. We concluded that exigent circumstances--namely the real risk that others were in the house and may have been unable to respond--validated the warrantless entry, given the unexplained medical emergency that Barrett was suffering and the officers' inability to contact anyone inside the house when they knew that other family members lived there. *Id.* at 294-95, 62 P.3d at 218-19.

Likewise, in *Araiza*, 147 Idaho at 376-77, 209 P.3d at 673-74, this Court concluded that exigent circumstances validated the warrantless entry into a residence, given the officers' reasonable concern for the safety of a resident and her two grandchildren. There, officers had seen an unidentified man outside the residence--after dark--who appeared to be attempting to enter through a window. Consequently, one of the officers knocked on the door and the resident,

6

an elderly woman, answered. Upon being informed of the officers' concerns, the elderly woman told the officers the man was named Roland and he was now inside. Once beckoned outside, the man identified himself as Roland Araiza and gave the officers his social security number and date of birth. A check of the information Araiza provided did not turn up a record. Then while his identity still remained unclear, Araiza went back inside the residence, closing and locking the door behind him. Afterwards, none of the occupants would open the door, answer the phone, or respond to knocking on the windows and beckoning from the officers. The officers' concern was heightened when another woman arrived on scene: identified herself as the elderly woman's daughter, denied recognizing Araiza's name, and stated that there should be no one else in the residence aside from the elderly woman and two young children. Additionally, a man, later identified as the elderly woman's grandson, arrived on the scene and also denied recognizing Araiza's name and agreed with the daughter that no one else should be inside except his grandmother and two young cousins. We concluded that exigent circumstances--namely the legitimate concerns for the elderly woman and the children--validated the warrantless entry, given that Araiza's identity remained a mystery and the officers attempted repeatedly to contact the occupants of the residence without success, and several family members expressed concern that an unauthorized individual was inside the home. *Id.* at 375-76, 209 P.3d at 672-73.

We conclude that in the instant case, there existed exigent circumstances that validated the warrantless entry into the residence, given the officers' reasonable concern for officer safety and the safety of potential victims within the apartment. The officers had received a report of a potential burglary in progress. The reporting party indicated that a male had crawled into the apartment through an exterior window, exited through the front door and unscrewed a light bulb to make the area dark, and then reentered the apartment. It was late at night and the apartment complex was located in a neighborhood that the officers were familiar with because of numerous investigations into reports of drug activity, domestic violence, and burglaries. Upon arriving at the apartment complex, the officers witnessed a male matching the description of the burglary suspect walking away from the apartment. The suspect, identified as Steger, appeared to be highly intoxicated and although he claimed to live in the apartment, the only identification he produced--his driver's license--listed a different address as his residence. Steger was also vague as to whether there were other people in the apartment. The officers went to the apartment's door and knocked and announced their presence. As the officers were at the front door, one of

the officers heard voices and sounds of items being moved inside the apartment. It was only when one of the officers slid open the window and moved the blinds to look inside that Ligon-Bruno, and eventually Trentino, appeared and finally exited the apartment under the officers' orders.

Ligon-Bruno argues on appeal that there was no reason for the police to fear that anyone else was still inside the apartment. Ligon-Bruno contends that his and Steger's statements of residing in the apartment and the fact that three men were already pulled outside should have relieved any fears the officers had that a crime had occurred. Steger and Ligon-Bruno's assurances that they resided in the apartment were not supported by evidence the officers possessed at the time: Steger's driver license listed another address as his primary residence, Steger gave vague and inconsistent statements as to whether anyone else was in the apartment, and no one appeared at the door when the police were loudly knocking and announcing their presence even though the officers could clearly hear activity coming from within the apartment. All of this weighed against the suspect's assurances that they resided in the apartment.

Ligon-Bruno also argues that the phone call to Steger's mother, in which she stated he lived in one of two apartment complexes on that side of Wyoming Avenue, should have dispelled any belief that something was amiss. We note that the mother's recollection of her son's residence and the men's assurances are analogous to the several cases where we have held that officers are not required to accept the assurances of someone who insists that things are fine within a residence when circumstances indicate otherwise. *See Araiza*, 147 Idaho at 376, 209 P.3d at 673 (citing *State v. Pearson-Anderson*, 136 Idaho 847, 850-51, 41 P.3d 275, 278-79 (Ct. App. 2001); *State v. Wiedenheft*, 136 Idaho 14, 17, 27 P.3d 873, 876 (Ct. App. 2001); *State v. Sailas*, 129 Idaho 432, 435, 925 P.2d 1131, 1134 (Ct. App. 1996). The mother's inability to correctly identify her son's apartment building, let alone the apartment number, did not dispel the other facts known to the officers at the time, all of which indicated suspicious circumstances. The same could be said for the men's inability to produce anything of substance to corroborate their statements. Thus, it was reasonable for the officers to doubt the men's assurances that they resided in the apartment.

Ligon-Bruno also distinguishes the facts in the instant case from those in *Araiza*. Ligon-Bruno asserts that unlike *Araiza*, once he and Trentino were removed from the apartment, there was no reason for the officers to believe that anyone else remained inside. Ligon-Bruno's

argument--because three men were pulled out of the apartment no one else could remain inside-- ignores the realities that the officers face on a daily basis. Just because the officers remove one or two people from a residence does not make it unreasonable for the officers to believe more suspects or potential victims remain inside. In fact, the reasoning that Ligon-Bruno wishes this Court to apply was already proven false by Trentino remaining inside once Ligon-Bruno and Steger were detained. The ability for a suspect, or potential victim, to remain in hiding is not affected by other people being removed from a residence.

Thus, where the officers reasonably believed a burglary was taking place, could not ascertain how many people were inside the apartment, and three suspected intruders could not produce identification to corroborate they lived in the apartment, we conclude that there existed exigent circumstances to justify the officers' warrantless entry into the residence.

**B.      Reentry and Protective Sweep**

Once inside, one of the officers did a protective sweep to determine whether anyone else was in the apartment. Another recognized exception to the warrant requirement for governmental searches is the protective sweep, which the United States Supreme Court first addressed in *Maryland v. Buie*, 494 U.S. 325 (1990). In that case, police obtained arrest warrants for Buie and another man, who were suspects in an armed robbery. Six or seven officers went to Buie's house to execute the warrant. One officer shouted into the basement, ordering anyone there to come out. Buie responded and emerged from the basement, at which point he was arrested. Thereafter, an officer entered the basement to determine if anyone else was there, and while in the basement he saw incriminating evidence in plain view.

The United States Supreme Court considered what level of justification was required for the officer to legally enter the basement, after Buie had been arrested, to determine whether others were present. Relying on *Terry v. Ohio*, 392 U.S. 1 (1968) and *Michigan v. Long*, 463 U.S. 1032 (1983), the Court concluded that the "reasonable, articulable suspicion" standard, which lies between the two extremes advocated by the parties, best met constitutional strictures. The Court held that this standard required "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. The Court cautioned that the search must be narrowly confined to a "cursory inspection of those spaces where a person may be found." *Id.* at 335. Further, the sweep may

9

last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id*. at 335-36.

Although *Buie* involved an in-home arrest, the Idaho Supreme Court has held that the exception applies even where the suspect has been detained, as long as "the officers have the requisite reasonable, articulable suspicion necessary to support the sweep." *State v. Revenaugh*, 133 Idaho 774, 778, 992 P.2d 769, 773 (1999). The type of offense suspected and the officers' experience with such offenses are relevant factors when considering the threat potential to the officers on the premises. *State v. Slater*, 133 Idaho 882, 887, 994 P.2d 625, 630 (Ct. App. 1999). Officers need not have actual knowledge or absolute proof that someone is lurking in the place to be searched who poses a threat to the officers. *Revenaugh*, 133 Idaho at 777, 992 P.2d at 772. After effecting an arrest or detention at a residence, if the officers can point to articulable facts, based upon their knowledge and experience, that support their belief that others may be on the premises, the officers can sweep the premises for other persons who might be in the house. *Slater*, 133 Idaho at 887, 994 P.2d at 630. Reasonable suspicion only requires articulable facts and inferences supporting a reasonable belief. *Id.*

From the articulable facts and the inferences known to the officers, it was reasonable to believe someone other than the three detained suspects remained in the house. As detailed above, the officers reasonably believed a burglary was taking place, could not ascertain how many people were inside the apartment, and the three detained suspects could not produce identification to corroborate that they lived in the apartment. It was also reasonable for the officers to believe that, having knocked and announced their presence without any answer and seeing Ligon-Bruno and Trentino peek around the hallway, someone else could have remained inside the residence. Moreover, once inside the officers discovered weapons in plain view, which added to their reasonable suspicion of danger. The protective sweep was a limited, speedy and cursory inspection for persons in the apartment. Based upon the combination of those unfolding circumstances, we conclude there was a sufficient level of reasonable, articulable suspicion that someone might be in the residence who could pose a threat to the officers on the scene to justify the officers' cursory search for such person or persons.

Ligon-Bruno also contends that the district court erred "when it found that the second entry was not a 'reentry' and that it was justified as a continuation of the protective sweep." In denying Ligon-Bruno's suppression motion on these grounds, the district court found that there

10

was not a reentry and that the officers merely continued the prior protective sweep. Specifically, the district court noted that:

> Deputy Bixby then entered the apartment again and conducted what the police call a protective sweep to determine if there were other people either appropriately or inappropriately in that apartment. In his testimony he said he cleared the living room, the kitchen, the hallway, and the bathroom and that he saw no one else in that--in those areas that he had cleared or checked for the presence of other persons. Mr. Ligon-Bruno and Mr. Trentino were brought back into the apartment at that point. And the testimony was that, and this was an interesting phrase for the Court, a more thorough visual sweep of the same rooms were done, including closets and bedrooms. I'm not sure what a visual sweep is other than potentially one using their eyes to sweep the room. But it looks like the deputies went back through the house to some degree, but they went to different places, into the closets and into the bedrooms, to see if there were other individuals there.
>
> The Court finds that to be not necessarily a reentry of the house. The police are already in the house. They are already conducting a safety sweep of that house. And just the fact that they bring the suspects into the house and then continue that safety sweep in a bit more detail does not mean that there was a reentry or that the safety sweep had lost its legitimacy and importance. The further, more detailed safety sweep was legitimate under the circumstances, and the Court finds it to be constitutionally supportable.

First, we will consider Ligon-Bruno's contention that the other officers and the suspects coming into the apartment was a reentry that required either a new, separate exigent circumstance or a valid warrant. Ligon-Bruno and Trentino had been removed from the apartment by the officers through the open front window as each made their presence known. One officer then entered through the window and conducted a brief protective sweep. The officer then opened the door which was taped shut on the inside and allowed the officers and the suspects to come into the apartment. That officer testified that the suspects were brought up into the apartment because "[i]t was cold outside. We had two chairs to set them down in. They weren't dressed very well." These circumstances, which allowed the other officers and the suspects to step inside the apartment, did not constitute a reentry that would require a warrant.[1]

---

[1] *Cf. State v. Heinen*, 114 Idaho 656, 659, 759 P.2d 947, 950 (Ct. App. 1988) ("As to the 'second search' performed after Heinen's booking, we find that it was, in essence, nothing more than a continuation of the initial search. To hold otherwise would suggest that should the police begin a valid search and some intervening circumstances (e.g. a sudden storm while performing a search in the open) arise, then the search would lose its validity. This would create a new 'category analysis' approach and that we are disinclined to undertake.").

We agree with the district court that the officers bringing the detained suspects back into the apartment was a continuation of the initial search and, thus, did not require separate exigent circumstances.

Next, we must consider whether it was proper for the officers to conduct a more thorough protective sweep once the suspects were brought back into the apartment. Ligon-Bruno focuses on the fact that the first protective sweep produced no suspects or victims. Ligon-Bruno argues that the first protective sweep dispelled all reasonable suspicion of danger; thus, depriving the officers of their ability to conduct another, or more thorough, protective sweep. As noted above, the officer had a reasonable suspicion of danger once he entered the apartment. Prior to allowing the other officers and suspects into the apartment, the officer looked in the living room, kitchen, hallway, and bathroom. Once the suspects were brought into the apartment and placed in chairs, the officers looked into the bedrooms and closets to ensure that nobody else was hiding in the apartment. This continued protective sweep was justified by the officers' reasonable belief that a burglary had taken place and the suspects not coming to the door when called to, giving vague answers as to whether other people remained in the apartment, and not producing identification to corroborate their claims that they resided in the apartment. Furthermore, during the initial protective sweep the officer found drug paraphernalia and various weapons scattered around the apartment. The officer's reasonable suspicion did not disappear simply because someone was not found in the kitchen, hallway, or bathroom as Ligon-Bruno contends. It was just as likely that someone remained in the apartment's bedrooms or closets after the suspects were brought into the apartment, as it was before the officer took such action. Lastly, the passage of time between when an officer develops a reasonable suspicion that someone else might be on the premises and when the officer concludes the protective sweep does not necessarily dispel that reasonable suspicion. *See State v. Prewitt*, 136 Idaho 547, 552, 38 P.3d 126, 131 (Ct. App. 2001) (concluding that the passing of seventeen minutes between the shooting and the arrival of other officers did not dispel the initial officers' reasonable suspicion that someone else might be on the premises that could pose a threat).

Thus, we hold that this continued, or more thorough, protective sweep was permissible in that it was based on reasonable articulable facts; was limited, speedy, and cursory in nature; and narrowly confined to locate people hiding in the apartment's bedrooms and closets. Because the continued protective sweep was permissible, the evidence found in the toilet tank is not

12

suppressible as the fruit of an invalid search. Therefore, the State's alternative argument that the evidence in the toilet tank lid would have been inevitably discovered pursuant to a valid probation search need not be addressed.

## III.

## CONCLUSION

We hold the district court correctly ruled that exigent circumstances existed, which validated the warrantless entry into Ligon-Bruno's apartment. The district court also correctly ruled that the officers had reasonable suspicion to conduct a protective sweep of the apartment's kitchen, bathroom, bedrooms, and closets. Accordingly, the denial of Ligon-Bruno's motion to suppress is affirmed.

Judge LANSING and Judge MELANSON **CONCUR.**