**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 38294**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2012 Opinion No. 50** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Filed: September 28, 2012** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **RODERICK RAINGER MANGUM,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Richard D. Greenwood, District Judge.

Judgment of conviction for forgery of a financial transaction card, <u>affirmed</u>.

Sara B. Thomas, State Appellate Public Defender; Eric D. Fredericksen, Deputy Appellate Public Defender, Boise, for appellant. Eric D. Fredericksen argued.

Hon. Lawrence G. Wasden, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent. Mark W. Olson argued.

---

SCHWARTZMAN, Judge Pro Tem

Roderick Rainger Mangum appeals from his judgment of conviction entered upon his conditional guilty plea to forgery of a financial transaction card. For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

In late 2008, investigators with the Idaho State Lottery Commission suspected Mangum of fraudulently purchasing lottery tickets with stolen credit cards. In the course of an investigation, they learned Mangum had an outstanding warrant for his arrest in California. The United States Marshals Service became involved due to the California warrant, and on November 10, 2008, the Lottery Commission's Deputy Director of the Enforcement Division, Amber French, and several deputies with the Marshals Service went to a Boise apartment address where it was believed Mangum was residing. In a common area of the apartment

1

complex, Chief Deputy U.S. Marshal Kevin Platts (Deputy Platts) made initial contact with a man believed to be Mangum, while French and her investigator proceeded to Mangum's apartment. Upon approaching Mangum, Deputy Platts identified himself as a U.S. Marshal and utilizing a technique to entice suspects into admitting their true identity and make them less likely to resist arrest, asked Mangum if his name was "Derrick." Mangum denied being "Derrick" and stated his name was "Rod Mangum." Deputy Platts asked Mangum for identification, to which Mangum replied, in some formulation, "Let's go back to my apartment and get my license. It's in my wallet." Mangum led the officers back to his apartment, continuing to deny he was the person Deputy Platts was looking for. When they reached Mangum's apartment, they found French and her investigator at the door, which was open, and a cable television employee inside the residence. Mangum's wallet was retrieved and his identification produced.[1] After confirming Mangum's identity, Deputy Platts arrested Mangum on the California warrant. While inside the residence, officers observed numerous receipts, gift cards and bank information lying on the kitchen table and, based on this evidence, obtained a warrant to search the remainder of the apartment. In executing the warrant, officers discovered approximately seventy-five stolen credit card numbers and other incriminating evidence.

Mangum was transported to California while Idaho authorities continued to investigate his Idaho crimes. On January 12, 2009, while Mangum was being held in the Orange County jail awaiting trial on his California charges, the State of Idaho charged him by criminal complaint with two counts of grand theft by unauthorized control, Idaho Code §§ 18-2403(3), 18-2407(1)(b). The district court issued an arrest warrant, which the Ada County Prosecutor's Office faxed to the Orange County Sheriff's Office on June 7, 2009. While still housed in the Orange County jail, Mangum became aware of the pending Idaho charges and arrest warrant. Commencing on June 8, he began sending letters to the Ada County Prosecutor's Office, the Ada County district court and Orange County jail staff, giving them notice of his whereabouts and

---

[1] There was disparate testimony from Deputy Platts and Mangum as to who entered the apartment first and who retrieved the wallet.

requesting transport to Idaho and final disposition of his Idaho charges pursuant to the Interstate Agreement on Detainers (IAD), codified in Idaho as Idaho Code §§ 19-5001 *et seq.*[2]

Mangum pled guilty to three felonies in California and was sentenced on June 30, 2009. On July 22, he was transferred from jail to a California State prison to serve his sentence. On October 19, he was transferred to another California State correctional facility. While in prison, Mangum continued to send letters to the Ada County Prosecutor's Office and district court, as well as inmate communications to California correctional officials, requesting transport to Idaho. In August 2009, California prison officials informed Mangum his request to invoke the IAD was premature because Idaho had not yet placed a detainer on him, a requirement under the statute. On October 19, the Ada County district court conducted a status hearing on the matter, during which an Ada County deputy prosecutor indicated he had been in contact with the California Department of Corrections regarding Mangum's requests to be transported to Idaho and anticipated receiving the requisite forms from California to complete the IAD process within the next few weeks. On October 23, California corrections officials generated a "detainer summary" acknowledging receipt of an Idaho detainer. As a result, Mangum was placed in administrative segregation.

On December 16, 2009, the California Department of Corrections prepared and executed the relevant IAD forms and forwarded them, along with Mangum's request, to the Ada County Prosecutor's Office and district court, who received them on December 28. Mangum was transported to Idaho, and he was arraigned on February 5, 2010. A preliminary hearing scheduled for February 19 was postponed due to the need to appoint new counsel for Mangum. On March 4, the State filed an amended complaint, charging Mangum with one count of forgery of a financial transaction card, I.C. § 18-3123; three counts of criminal possession of a financial card, I.C. §§ 18-3125(3), 18-204; and one count of misappropriation of personal identifying information, I.C. §§ 18-3126, 18-3128, 18-204. A jury trial was scheduled for May 12, 2010.

---

[2] As we discuss below, one of the requirements to trigger the provision in the IAD that an inmate must be brought to trial in the receiving State within 180 days, is that the inmate "caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint . . . ." Idaho Code § 19-5001(c)(1). Hereinafter, for the sake of clarity, we refer to an inmate's written notice of the place of his imprisonment and request for final disposition as a "request" pursuant to the IAD.

During a March 16, 2010, hearing Mangum indicated his intention to file a motion to dismiss based on a violation of the IAD requirement that he be tried within 180 days of filing the requisite request and a motion to suppress evidence found during the search of his apartment. The district court rescheduled the jury trial for August to accommodate these motions. On April 27, Mangum filed a motion to dismiss the criminal information, arguing the State violated the IAD by failing to bring him to trial within 180 days of his request under the statute. Mangum also filed a motion to suppress evidence law enforcement officers found in his apartment following execution of the search warrant, contending there was no lawful basis for the officers' initial entry, during which they observed evidence that later formed the basis of the search warrant. Prior to the district court's rulings on his motions, Mangum entered a conditional guilty plea to one count of forgery of a financial transaction card, preserving his right to appeal if the district court denied either motion. Following a hearing on each motion, the district court denied both motions. The district court entered a judgment of conviction and imposed a unified sentence of fourteen years, with five years determinate. Mangum now appeals the denials of his motion to dismiss and motion to suppress.

## II.

## ANALYSIS

### A.     Motion to Dismiss

Mangum claims the district court erred in denying his motion to dismiss based on the State's alleged failure to comply with the 180-day trial provision pursuant to the IAD. This Court exercises free review over the application and construction of statutes. *State v. Reyes*, 139 Idaho 502, 505, 80 P.3d 1103, 1106 (Ct. App. 2003). Where the language of a statute is plain and unambiguous, this Court must give effect to the statute as written, without engaging in statutory construction. *State v. Burnight*, 132 Idaho 654, 659, 978 P.2d 214, 219 (1999); *State v. Escobar*, 134 Idaho 387, 389, 3 P.3d 65, 67 (Ct. App. 2000). The language of the statute is to be given its plain, obvious, and rational meaning. *Burnight*, 132 Idaho at 659, 978 P.2d at 219. If the language is clear and unambiguous, there is no occasion for the court to resort to legislative history or rules of statutory interpretation. *Escobar*, 134 Idaho at 389, 3 P.3d at 67. When this Court must engage in statutory construction because an ambiguity exists, it has the duty to ascertain the legislative intent and give effect to that intent. *State v. Beard*, 135 Idaho 641, 646, 22 P.3d 116, 121 (Ct. App. 2001). To ascertain such intent, not only must the literal words of the

4

statute be examined, but also the context of those words, the public policy behind the statute, and its legislative history. *Id.* Although a State must adopt the IAD by statute to be a party to the agreement, the United States Supreme Court has held the agreement's interpretation presents a question of federal law. *State v. Breen*, 126 Idaho 305, 307 n.2, 882 P.2d 472, 474 n.2 (Ct. App. 1994) (citing *Cuyler v. Adams*, 449 U.S. 433, 442 (1981)). Therefore, we give particular attention to federal court decisions interpreting the IAD. *Id.*

The IAD, codified in Idaho as Idaho Code §§ 19-5001 *et seq.*, is an interstate compact authorized by Congress to provide a cooperative agreement between party States on detainers. I.C. § 19-5001(a); *Breen*, 126 Idaho at 306, 882 P.2d at 473. It establishes procedures for the transfer of a prisoner incarcerated in one State to temporary custody in a second State for disposition of charges pending there and allows a prisoner to compel adjudication of those pending criminal charges. I.C. § 19-5001(c)(1); *Breen*, 126 Idaho at 306, 882 P.2d at 473. Its purpose is to address concerns that untried charges pending in other jurisdictions and difficulties in securing a speedy trial "produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." I.C. § 19-5001(a). The IAD procedures apply only to prisoners who have been convicted and sentenced, and are currently serving time in a penal or correctional institution of a party State. I.C. § 19-5001(c)(1); *Breen*, 126 Idaho at 307, 882 P.2d at 474.

For a defendant to invoke the speedy trial provision of the IAD, three events must occur: (1) the receiving State must place a detainer on a prisoner in the sending State, I.C. § 19-5001(c)(1); (2) the prisoner must deliver to the warden or custodial official holding custody over the prisoner a written notice and request for final disposition, I.C. § 19-5001(c)(2);[3] and (3) the warden or custodial official must promptly forward the prisoner's request and a certificate containing the "term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner" to the appropriate prosecutor and district court in the receiving State, I.C. § 19-5001(c)(1), (2). Failure to bring a prisoner to trial within the applicable statutory time period requires a dismissal, with prejudice, of all charges. I.C. § 19-5001(c)(4), (d)(5).

---

[3] Subsection (c)(3) places a corresponding duty on the warden or custodial official to promptly inform the prisoner of the source and contents of the detainer and the prisoner's right to make a request for final disposition of the untried charge.

In denying Mangum's motion to dismiss pursuant to the IAD, the district court concluded a formal detainer from Idaho was not lodged in California until December 16, 2009, and the 180-day time limit was not triggered until the requisite paperwork, including the certificate required by the statute, was received by the Ada County Prosecutor's Office and district court on December 28, 2009, from the California corrections facility where Mangum was being held. The district court concluded that because the trial was initially scheduled to commence on May 12, 2010, until it was postponed due to Mangum's pretrial motions, the State had complied with the IAD's 180-day timeline.

On appeal, Mangum contends the district court erred in concluding his IAD rights were not formally invoked until Idaho received the requisite documents via California officials in late December 2009. He argues that both the prosecutor and the district court had actual notice of his request for disposition under the IAD as early as August 28, 2009, but not later than October 19, 2009, by way of his letters, and that these letters amounted to "substantial compliance" with the IAD requirements. This issue requires us to address a question of first impression in Idaho: the degree to which a prisoner must comply with the procedural requirements of the IAD in order to receive the protections of the statute. More specifically, we must determine the validity of Mangum's assertion that actual notice of his IAD request, including his imprisonment status, location and request for disposition, was sufficient even where the formal procedural requirements of the statute were not yet met.

Here, there is no dispute that between June and October 2009, the Ada County Prosecutor's Office and district court received several letters from Mangum wherein he asserted his speedy trial right under the IAD and included information regarding his place of imprisonment and sentence. However, none of these letters were accompanied by a certificate of inmate status as required by the statute, nor was the request forwarded to Idaho officials through California correctional officials as is also required by the statute. If these requirements are mandatory under the IAD, Mangum's personal letters were ineffective to trigger the running of the IAD's speedy trial time limit.

Having examined federal and state case law construing the requirements of the IAD, as well as the policy rationales underlying those requirements, we are convinced that an inmate who wishes to invoke the statute's dismissal provision must, at the very least, ensure the receiving State has been given all the information expressly listed in the statute, including a certificate of

6

inmate status issued and forwarded by correctional officials of the sending State.[4] Looking first at the language of the IAD, we note the relevant provision sets forth in absolute terms the requirement that the receiving State be provided the certificate of inmate status and the information therein. Section 19-5001(c)(1) commands the prisoner's request "*shall* be accompanied by a certificate" of inmate status. (Emphasis added.) In addition, the statute states:

> The written notice and request for final disposition referred to in paragraph (1) of this subsection *shall* be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him, who *shall* promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

I.C. § 19-5001(2) (emphasis added). The United States Supreme Court has specifically recognized that as used in the IAD, the word "shall" is "the language of command." *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001).

A strict compliance interpretation is also consistent with the United States Supreme Court's holding in *Fex v. Michigan*, 507 U.S. 43 (1993). Although *Fex* did not address what information a prisoner must supply a receiving State in order to initiate the 180-day period, the Court's analysis is instructive in addressing the question. Fex, a prisoner in Indiana, was brought to trial in Michigan 196 days after he gave a request for final disposition to the Indiana prison officials and 177 days after the request for final disposition was received by the Michigan prosecuting attorney and court. Fex moved for a dismissal of the charges pursuant to the IAD on the basis his trial did not begin until after the 180-day time limit set forth in the statute had passed. The Supreme Court indicated the outcome of the case turned on the meaning of the phrase in the statute, "'within one hundred and eighty days after he shall have *caused to be delivered*,'" specifically, whether the phrase refers to the mere sending of the request by the prisoner to custodial authorities or whether it required actual receipt of the request by the receiving State. *Id*. at 47 (emphasis added).

In determining that the time limit was not triggered until the documents were actually delivered to the receiving State, the *Fex* Court strictly construed the delivery requirement of the

---

[4]    As we discuss below, some jurisdictions have found an exception to this requirement of strict compliance where intentional State interference impedes the prisoner's ability to comply with the statute. However, such circumstances were not present here, and therefore, we need not address the applicability of this exception in Idaho.

statute and noted that "no one can have 'caused something to be delivered' unless delivery in fact occurs." *Id*. In coming to this conclusion, the Court weighed the implications of construing the phrase more liberally and declined to depart from a strict application of the language, reasoning that the possibility prosecution will be precluded before the prosecutor even knows a speedy trial has been requested is "significantly worse" than that the prisoner's attempted invocation of the IAD will fail through no fault of his own. *Id*. at 49-51. In so doing, the Supreme Court rejected the inmate's policy argument:

> "Fairness requires the burden of compliance with the requirements of the IAD to be placed entirely on the law enforcement officials involved, since the prisoner has little ability to enforce compliance," . . . and that any other approach would "frustrate the higher purpose" of the IAD, leaving "neither a legal nor a practical limit on the length of time prison authorities could delay forwarding a [request]."

*Id*. at 52 (internal citations omitted). The Supreme Court responded:

> These arguments, however, assume the availability of a reading that would give effect to a request that is never delivered *at all*. . . . As we have observed, the textual requirement "shall have caused to be delivered" is simply not susceptible of such a reading. Petitioner's "fairness" and "higher purpose" arguments are, in other words, more appropriately addressed to the legislatures of the contracting States, which adopted the IAD's text.

*Id*.

There has long existed a split between jurisdictions as to whether substantial compliance with the procedural requirements of the IAD is sufficient to trigger the 180-day speedy trial period; however, the majority of jurisdictions addressing the issue since *Fex* have concluded that prisoners attempting to invoke the provisions of the IAD must strictly comply with the provisions set forth by the statute. *See United States v. Paredes-Batista*, 140 F.3d 367, 374 (2d Cir. 1998) (following *Fex* and explaining "[t]he Supreme Court has stated unequivocally that the IAD is to be read literally"); *United States v. Collins*, 90 F.3d 1420, 1426 (9th Cir.1996) (stating "*Fex* instructs us that the [IAD] means what it says. And when it says that the prisoner must have his demand 'delivered to the . . . appropriate court,' that is what it means.").

Several state courts have extended *Fex's* requirement of strict compliance beyond the determination of when a request pursuant to the IAD has been "caused to be delivered" to other procedural requirements of the statute. For example, in *State v. Moe*, 581 N.W.2d 468 (N.D. 1998), North Dakota charged Moe with various crimes and filed a detainer with Colorado

8

authorities, where Moe was incarcerated. Moe's attorney served a request for speedy trial upon the warden of the Colorado prison and upon the State's attorney in North Dakota. The request did not include the certificate from the warden required under the IAD. The district court determined the request did not comply with the IAD to trigger the speedy trial provision.[5] Moe argued on appeal that although his request had not included a certification from Colorado officials, nor been forwarded through those officials, in all other respects he had complied with the IAD and North Dakota had "actual notice" he was incarcerated in Colorado, which satisfied the intent and purpose of the IAD. *Id*. at 471. In rejecting this argument, the North Dakota Supreme Court held strict compliance with the IAD is required to commence the 180-day timeline, citing to caselaw from various jurisdictions. *Id*. at 471-72. The court also indicated "actual notice" does not necessarily put the receiving State on notice of the information that would be included in the certificate of an official having custody over the defendant and there were various policy rationales for requiring strict compliance with the IAD's requirements. *Id*. *Accord Johnson v. People*, 939 P.2d 817, 820-21 (Colo. 1997) (requiring strict compliance with the IAD's procedural requirement that "the custodial official must forward the prisoner's request for a final disposition and a certification containing information regarding the prisoner's incarceration to the appropriate court and the prosecuting officer"); *State v. Greenwood*, 665 N.E.2d 579, 581-82 (Ind. 1996) (requiring strict compliance with IAD procedures and holding that merely delivering a request is not sufficient as the request must be delivered pursuant to the provisions of the IAD, which requires that the request be forwarded via the custodial State's correctional officials); *Isaacs v. State*, 358 A.2d 273, 277-78 (Md. Ct. Spec. App. 1976), *overruled on other grounds by State v. Dean*, 399 A.2d 1367 (Md. Ct. Spec. App. 1979) (holding the IAD's language, that "'(t)he request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner . . .' containing the information specified in the statute, is mandatory and not directory"); *Eckard v. Commonwealth*, 460 S.E.2d 242, 245-46 (Va. Ct. App. 1995) (holding strict compliance with the IAD is required and actual notice

---

[5] Moe also attempted to effect a second request pursuant to the IAD, but it was never delivered to North Dakota officials. On appeal, the Court applied *Fex* to easily dispose of Moe's argument that this constituted a valid request since North Dakota officials had never received the second request.

of a request directly from the defendant, unaccompanied by the requisite certificate, was insufficient).

Requiring prisoners to strictly comply with the IAD's information and certificate requirements furthers the overall purpose of the statute. Strict compliance ensures the prosecuting attorney will be notified precisely when the IAD has been invoked without being required to "analyze each communication from a prisoner with a fine-tooth comb to determine whether it should be construed as invoking the IAD." *Nash v. Jeffes*, 739 F.2d 878, 884 (3d Cir. 1984), *overruled on other grounds by Carchman v. Nash*, 473 U.S. 716 (1985)). *See also United States v. Henson*, 945 F.2d 430, 434 (1st Cir. 1991) ("A vital aim of the requirement of strict compliance is to assure that the appropriate prosecuting authorities promptly are placed on notice when [the IAD] is invoked by an inmate."). If a premature communication, or one which is misdirected or fails to provide the information required by the statute, were to be considered sufficient to trigger the 180-day provision under the IAD, it could create "a trap for unwary prosecuting officials" and undermine the primary purpose of the IAD, that of affording a systematic method of rapidly adjudicating charges against prisoners held in another jurisdiction. *Id*. *Accord Johnson v. Stagner*, 781 F.2d 758, 761-62 (9th Cir. 1986) (noting that courts have generally required prisoners to strictly comply with IAD procedures before they will dismiss charges on the basis of a violation of its 180-day time limit and that the technical requirements for filing a request for disposition under the IAD further the underlying purpose of rapid adjudication); *Nash*, 739 F.2d at 884 (same). Indeed, Mangum himself illustrates the difficulty of the approach he advances, as he does not pinpoint an exact date on which he alleges the prosecutor had "adequate knowledge" to trigger the 180-day requirement under the IAD, instead contending it was as "early as August 28, 2009, but as late as October 19, 2009." To impose the severe penalty of dismissal with prejudice in light of such uncertainty is clearly unreasonable.

There also exists good reason for the statute's requirement that the information be in the form of a certificate forwarded *via* the sending State's correctional authorities as opposed to transmitted informally by the prisoner, as initially occurred here. Namely, it assures the receiving state that the information obtained is accurate and current. *See Norton v. Parke*, 892 F.2d 476, 481 (6th Cir. 1989); *Johnson*, 939 P.2d at 821; *Ward v. State*, 435 N.E.2d 578, 580 (Ind. Ct. App. 1982); *Commonwealth v. Copson*, 830 N.E.2d 193, 202 (Mass. 2005). If the receiving state were left to rely on the prisoner's representation of these facts, it would be forced

to corroborate the accuracy of these representations before deciding whether to move forward on the prisoner's case; all the while, the 180-day period would be running. *Copson*, 830 N.E.2d at 202-03. Not only would this shift the burden of obtaining accurate information to the prosecution in a manner inconsistent with the terms of the IAD, it also would significantly delay the resolution of these cases. *Id*. at 203. This requirement is not a mere technicality, as validation of information from the official having custody is important to prosecuting officials in the receiving State. *Greenwood*, 665 N.E.2d at 581-82 (holding that to comply with the IAD, a prisoner must do more than merely deliver a request to the appropriate parties; such a request must be made pursuant to the strictures of the statute, which includes a requirement that the defendant deliver his request to custodial officials so they can forward the request along with appropriate certifications to the prosecuting authorities).

Furthermore, fairness compels that a prisoner who wishes to hold the State accountable for precise compliance with the 180-day period, on threat of dismissal of charges, must comply with certain key aspects of the IAD. *See Copson*, 830 N.E.2d at 203. After all, the IAD has two primary goals: to give a prisoner the right to request a trial within 180 days and to give a State the right to obtain a prisoner for purposes of trial. *Bozeman*, 533 U.S. at 151. As the Massachusetts Supreme Court has noted, the statute creates a three-party balance that is dependent on all parties fulfilling their respective obligations: the prisoner must provide the receiving State, through his custodian, with specific information; the sending State must certify and forward that information and release the prisoner to the receiving State; and the receiving State must bring the prisoner to trial within a certain time frame. *Copson*, 830 N.E.2d at 203. To allow a prisoner to demand of the other parties a level of compliance that he has not achieved skews this balance. *Id*.

The record in this case indicates Mangum was informed of his rights by California authorities and there is no indication he was actively thwarted in his attempt to invoke those rights. Although there was some confusion in the California corrections system as to if and when a detainer was actually filed by Idaho, and California corrections officials did not immediately forward the official certifications to Idaho authorities, there is no evidence that any delay was the result of purposeful interference with his rights under the IAD. *See* 35 C.J.S. *Extradition and Detainers* § 103 (2012) (noting many jurisdictions have held that in "all cases, except where the prisoner's failure to meet the technical requirements of the [IAD] is due to

intentional or negligent sabotage by government officials, the prisoner must strictly comply with the [IAD's] formal notice requirements"). While the process may not have moved as quickly as Mangum desired, there is no indication it was intentionally or purposefully delayed by government officials to interfere with his rights under the IAD.

Accordingly, we conclude the IAD requires strict compliance with its request provisions, at least where no intentional interference by State parties is shown. Thus, the IAD 180-day limit was triggered on December 28, 2009, the date Idaho officials received the requisite certificates, forwarded via California correctional authorities, as opposed to any earlier date Idaho officials may have had "actual notice" of Mangum's whereabouts, incarceration status, and request to invoke his IAD rights.

**B.      Motion to Suppress**

Mangum contends the district court erred in denying his motion to suppress because the search warrant that issued was based on observations made by law enforcement officers during an unlawful, warrantless entry into his apartment. Specifically, he argues there was not substantial evidence to support the district court's finding that Mangum implicitly consented to the officers' entry into his apartment.

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures. The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972); *State v. Reynolds*, 146 Idaho 466, 469, 197 P.3d 327, 330 (Ct. App. 2008). An officer's warrantless entry into a residence is presumptively unreasonable and prohibited by the Fourth Amendment. *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984); *State v. Curl*, 125 Idaho 224, 225, 869 P.2d 224, 225 (1993); *State v.*

12

*Abeyta*, 131 Idaho 704, 707, 963 P.2d 387, 390 (Ct. App. 1998). This presumption is strong and may be overcome only under limited, well-recognized exceptions, such as an entry based upon probable cause and exigent circumstances or consent. *Payton v. New York*, 445 U.S. 573, 589-90 (1980); *Reynolds*, 146 Idaho at 469-70, 197 P.3d at 330-31; *Abeyta*, 131 Idaho at 707, 963 P.2d at 390. The State bears the burden to show that a warrantless search fell within one of these well-recognized exceptions to the warrant requirement or was otherwise reasonable under the circumstances. *Reynolds*, 146 Idaho at 470, 197 P.3d at 331.

A search conducted with freely given consent is an exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Garcia*, 143 Idaho 774, 778, 152 P.3d 645, 649 (Ct. App. 2006). In Idaho, consent must be voluntarily given, may be express or implied, and must not result from coercion or duress. *State v. Biggs*, 113 Idaho 595, 598, 746 P.2d 1054, 1057 (Ct. App. 1987). Consent to search may be in the form of words, gestures, or conduct. *State v. Fleenor*, 133 Idaho 552, 554-55, 989 P.2d 784, 786-87 (Ct. App. 1999); *State v. Knapp*, 120 Idaho 343, 348, 815 P.2d 1083, 1088 (Ct. App. 1991). It falls to the State to prove, by a preponderance of the evidence, that consent was voluntary.[6] *Schneckloth*, 412 U.S. at 221; *State v. Hansen*, 138 Idaho 791, 796, 69 P.3d 1052, 1057 (2003); *Garcia*, 143 Idaho at 778, 152 P.3d at 649. The consent to entry is distinct from the consent to search subsequent to entry. The standard for measuring the scope of consent under the Fourth Amendment is that of objective reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *State v. Ballou*, 145 Idaho 840, 849, 186 P.3d 696, 705 (Ct. App. 2008).

In its memorandum denying Mangum's motion to suppress, the district court found that after Deputy Platts asked Mangum if he was "Derrick" and asked for Mangum's identification, ostensibly to prove he was not "Derrick," Mangum responded, "'Let's go back to my apartment and get my license. It's in my wallet,' or words of similar import." Mangum then "led" the officers back to his apartment to obtain his identification where they saw French and her investigator at the door. The district court further indicated there was "some dispute as to

---

[6] Mangum raises the issue of the voluntariness of his consent on appeal. However, he did not raise this issue below and, therefore, we confine our analysis to whether he actually consented to the officers' entry.

whether the door was completely or partially ajar and whether Mr. Mangum or Deputy Platts first entered the apartment," as well as whether it was Mangum or Deputy Platts who grabbed Mangum's wallet and produced his identification.

The district court found, based on the circumstances surrounding the officers' entry into Mangum's apartment, that Mangum had impliedly consented to the entry. Specifically, the court found Mangum did more than merely fail to object to the officers' entry into his apartment, but impliedly consented to the entry by stating, "Let's go back to my apartment and get my license," after being asked for identification. Further, the court surmised, when Mangum did actually lead the officers to his apartment, Mangum's statement, combined with his conduct, would reasonably lead law enforcement to believe they could escort him through the open door to retrieve his license.[7]

We conclude there was substantial evidence to support the district court's finding that Mangum's statement to the officers, in conjunction with his leading them back to his apartment and walking through the open door, where a third party was already present, into the apartment with Deputy Platts following (according to Deputy Platts' testimony), constituted implied consent to their entry. *See Reynolds*, 146 Idaho at 472, 197 P.3d at 333. The district court explicitly found Mangum impliedly consented to the officers' entry for the limited purpose of retrieving his identification.[8] Inherent in this finding is the fact the court believed Deputy Platts' recitation of the events were credible, as was the court's prerogative. *See Valdez-Molina*, 127 Idaho at 106, 897 P.2d at 997.

### III.

### CONCLUSION

We conclude an inmate must strictly comply with the request requirements of the IAD. Because the statute requires the requisite certificate and information to be forwarded via the sending State's correctional officials in order to trigger the IAD speedy trial provision,

---

[7]     We note that by the time Deputy Platts and Mangum arrived at the partially opened apartment door, there was more than sufficient probable cause to arrest Mangum as the fugitive in question.

[8]     The court also found that Mangum revoked his consent once he realized he was being arrested and that thereafter the officers did no more than secure the premises pending the arrival of a search warrant.

Mangum's letters to Idaho authorities did not commence the 180-day time limit. Thus, there was no violation of the speedy trial provision of the IAD and the district court did not err in denying Mangum's motion to dismiss. The district court also did not err in denying Mangum's motion to suppress evidence seen by officers during their entry into his apartment because there was substantial evidence to support the district court's conclusion that Mangum had impliedly consented to the officers' entry. The district court's orders denying Mangum's motion to dismiss and motion to suppress are affirmed. Accordingly, Mangum's judgment of conviction entered upon his conditional guilty plea to forgery of a financial transaction card is also affirmed.

Judge LANSING and Judge MELANSON **CONCUR.**